**William L. GUNTER and Camille S. Gunter, Plaintiffs-Appellants,**

v.

**Theodore M. HUTCHESON, et al., Defendants-Appellees.**

No. 81–7129.

United States Court of Appeals, Eleventh Circuit.

April 30, 1982.

864

Gambrell, Russell & Forbes, Harold L. Russell, Thomas W. Rhodes, Jane K. Wilcox, Atlanta, Ga., for plaintiffs-appellants.

Thomas C. Harney, Kilpatrick & Cody, Atlanta, Ga., for defendants-appellees Vann, Cobble, Chepul, Rankin and Holliday.

John A. Chandler, Sutherland, Asbill & Brennan, J. D. Fleming, Jr., Atlanta, Ga., Frank L. Skillern, Jr., Albert J. Tumpson, Federal Deposit Ins. Corp., Washington, D. C., for defendant Federal Deposit Ins. Corp.

Before MORGAN, KRAVITCH and HENDERSON, Circuit Judges.

KRAVITCH, Circuit Judge:

Appellants William L. and Camille S. Gunter appeal from the district court's grant of summary judgment[1] for the Federal Deposit Insurance Corporation [FDIC] in this action by the Gunters to rescind a $3 million note due to alleged securities law violations and fraud. The Gunters assert that the trial court erred in holding that the FDIC was immune from fraud claims under a rule of federal common law. For the reasons stated below, we affirm the trial court. 492 F.Supp. 546.

## I. Background

The Federal Deposit Insurance Corporation is a federal agency which insures bank deposits. As insuror one of the primary duties of the FDIC is to pay the depositors of a failed bank. The FDIC has two methods of accomplishing this duty. The simplest method is to liquidate the assets of the bank and then pay the depositors their insured amounts,[2] covering any shortfall with insurance funds. This option, however, has two major disadvantages. First, the sight of a closed bank, even an insured one, does not promote the utmost confidence in the banking system. Accounts are frozen, checks are returned unpaid, and a significant disruption of the intricate financial machinery results. Second, depositors may wait months to recover even the insured portion of their funds, and uninsured funds may be irrevocably lost.

To avoid the significant problems with liquidation, the FDIC whenever feasible employs a "purchase and assumption" transaction in which the Corporation attempts to arrange for another bank to "purchase" the failed bank and reopen it without interrupting banking operations and with no loss to the depositors. A purchase and assumption involves three entities: the receiver of the failed bank, the purchasing

bank, and the FDIC as insuror. In most cases, the FDIC is appointed receiver by the appropriate banking authority[3] and thus acts in two separate capacities: as receiver and as corporate insuror. *See FDIC v. Ashley*, 585 F.2d 157 (6th Cir. 1978).

As soon as the receiver is appointed, the FDIC solicits bids from other banks for the purchase of the failed bank and assumption of its liabilities. The bids represent the "going concern" value of the failed bank. After receiving the bids, the FDIC Board of Directors determines whether the purchase and assumption is feasible according to the statutory requirements of 12 U.S.C. § 1823(e). If a bid is accepted, the purchasing bank agrees with the receiver to buy the assets and assume the liabilities of the failed bank.

While the purchase of a failed bank is an attractive way for other banks to expand their operations, a purchase and assumption must be consummated with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services. Because the time constraints often prohibit a purchasing bank from fully evaluating its risks, as well as to make a purchase and assumption an attractive business deal, the purchase and assumption agreement provides that the purchasing bank need purchase only those assets which are of the highest banking quality. Those assets not of the highest quality are returned to the receiver, resulting in the assumed liabilities exceeding the purchased assets. To equalize the difference, the FDIC as insuror purchases the returned assets from the receiver which in turn transfers the FDIC payments to the purchasing bank. The FDIC then attempts to collect on the returned assets to minimize the loss to the insurance fund. In an appropriate case, therefore, the purchase and assumption benefits all parties. The FDIC minimizes its loss, the purchasing bank receives a new investment and expansion opportunity at low risk, and the deposi-

1. This is an interlocutory appeal with jurisdiction based on 28 U.S.C. § 1292(b).

2. Currently each depositor is insured up to $100,000. 12 U.S.C. § 1821(a).

3. The FDIC is required by statute to accept an appointment as receiver of a failed bank. 12 U.S.C. § 1821(c), (e).

tors of the failed bank are protected from the vagaries of the closing and liquidation procedure.

The mechanics of a purchase and assumption transaction likely were completely unknown to William L. and Camille S. Gunter when in December, 1974, they purchased 61% of the outstanding common stock of Hamilton Bank & Trust Company of Atlanta [Atlanta Hamilton]. The Gunters paid $5.5 million dollars for their controlling interest in Atlanta Hamilton, which they borrowed from Hamilton National Bank of Chattanooga, Tennessee [Chattanooga Hamilton], executing two promissory notes for $2.5 and $3.0 million respectively.

At the close of business on February 16, 1976, the Chattanooga Hamilton was declared insolvent and the FDIC was appointed receiver. The Corporation immediately solicited bids on a purchase and assumption transaction and received a high bid of $16,251,000 from the First Tennessee National Bank [First Tennessee]. The FDIC accepted the bid and Chattanooga Hamilton reopened the following morning under the First Tennessee name.

The Gunter notes were among the assets transferred to First Tennessee in the transaction. Pursuant to its rights under the purchase and assumption agreement, First Tennessee returned the $3 million note to the FDIC as receiver, which in turn sold the note to the FDIC as corporate insuror for approximately $3.2 million.

In October of 1976, the Atlanta Hamilton also became insolvent. The Gunters then filed suit against the former directors and officers of Chattanooga Hamilton, seeking damages and rescission of the notes on the basis of violation of federal and state securities laws and state and common law fraud.[4] The Gunters alleged that their purchase of the Atlanta Hamilton stock was induced by fraudulent misrepresentations made to them by the officers and directors of Chattanooga Hamilton.[5] The Gunters also sought rescission of the $3 million note held by the FDIC on the same grounds, and the FDIC counterclaimed for payment of the note.

The FDIC moved for summary judgment on the theory that it was protected by the Gunters' claims either by 12 U.S.C. § 1823(e) or by federal common law. For the purposes of the summary judgment motion, the FDIC agreed that the Gunters were defrauded into their stock purchase and that this fraud ordinarily would be adequate grounds for rescission. The district court granted the motion, holding that although the statutory protection of 12 U.S.C. § 1823(e) did not extend to the Gunters' fraud claims, the FDIC had a defense to claims of fraud of which it lacked knowledge under a rule of federal common law.[6] The Gunters sought certification of this decision for interlocutory appeal under 28 U.S.C. § 1292(b). The certification was granted and accepted by this court.

## II. Defenses to the State and Common Law Fraud Claims

### A. *The Defense Under 12 U.S.C. § 1823(e)*

■ The FDIC first asserts that the Gunters' rescission action is barred by 12 U.S.C. § 1823(e) which states in relevant part:

---

**4.** Specifically, the Gunters' complaint alleged violations of the Securities Exchange Act of 1934 §§ 10(b), 29, 15 U.S.C. §§ 78j(b), 78cc, and Securities and Exchange Commission rule 10b–5, 17 C.F.R. § 240.10b–5 (count I); the Securities Act of 1933 § 17(a), 15 U.S.C. § 77q(a) (count II); Ga.Code Ann. §§ 97–112(a) and 97–114 (count III); Ga.Code Ann. §§ 105–301, 105–302, and 105–304 (count IV); and common law fraud and deceit (count V).

**5.** These misrepresentations included, among others, (1) that Chattanooga Hamilton would leave $7 million in certificates of deposit in the Atlanta Hamilton for at least one year from the Gunters' acquisition of the stock; (2) that Atlanta Hamilton would continue to have a feder-

al funds line of $1 million through the Chattanooga Hamilton; (3) that the Chattanooga Hamilton was in sound financial condition and would be able to offer continued financial support to the Atlanta Hamilton; (4) that the Atlanta Hamilton would net $500,000 per year and the Gunters would make enough in stock dividends to pay the interest on their notes; and (5) that the interest on the notes would in certain circumstances be deferred.

**6.** As an alternative holding, the district court ruled that the Gunters' federal securities laws claims against the FDIC were barred by the innocent purchaser defense in § 29(c) of the Exchange Act, 15 U.S.C. § 78cc(c).

No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this action, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

The FDIC argues that the fraud asserted by the Gunters is in the nature of an agreement between the Gunters and Chattanooga Hamilton's officers and directors to perform certain promises made in connection with the Atlanta Hamilton stock sale. Because the "agreement" was not in writing, the argument continues, it cannot defeat the rights of the FDIC under the "no agreement" language of § 1823(e).[7]

■ We cannot agree with the FDIC's analysis of this issue, although several recent Fifth Circuit cases have involved the protection of § 1823(e), and in all the FDIC has prevailed. In *Black v. FDIC*, 640 F.2d 699 (5th Cir.), *cert. denied*, — U.S. —, 102 S.Ct. 143, 70 L.Ed.2d 119 (1981), for example, the obligor attempted to prove that a real estate development loan agreement with a bank included the unwritten understanding to make construction loans on certain real estate. The court held that the unwritten agreement could not be asserted against the FDIC. Similar situations occurred in *FDIC v. Lattimore Land Corp.*, 656 F.2d 139 (5th Cir. 1981) (oral agreement to make future loans), *Chatham Ventures, Inc. v. FDIC*, 651 F.2d 355 (5th Cir. 1981) (assertion that bank breached joint-venture agreement), and *FDIC v. Hoover-Morris Enterprises*, 642 F.2d 785 (5th Cir. 1981) (obligor asserted that bank had agreed to take a deed in satisfaction of the debt).

The common thread running through these cases has been the assertion by the obligor that an oral side agreement with the bank controlled the rights of the parties.[8] The cases, therefore, came squarely within the "no agreement . . . shall be valid" language of § 1823(e). The claim asserted by the Gunters, in contrast, is quite different. The essence of their argument is that no agreement existed because of the fraud of Chattanooga Hamilton's officers. While certain of the alleged misrepresentations could be construed as "agreements" to perform certain acts in the future, such as deferring interest on the Gunters' notes, others clearly are not agreements of any sort. For example, the Gunters alleged that the chairman of the board of Chattanooga Hamilton fraudulently represented that the Hamilton banking system was in "sound financial condition." Far from claiming that an oral agreement is "valid" and controls the rights of the parties, the Gunters assert that the entire transaction was invalid from the beginning. As the district court noted, this claim is directly opposite to the "shall be valid" language of § 1823(e). Consequently, we agree with the trial court that the fraud claims at issue here are not barred by the statutory language in § 1823.

---

**7.** Alternatively, the FDIC asserts that the fraud was in connection with the sale of stock, not the note held by it. The record clearly shows that the note and stock sale were part of a single transaction, however, and we refuse to arbitrarily dichotomize this single transaction into two component parts. To do so would render the defense of fraud in the inducement a practical nullity, since the fraud usually pertains to the transaction underlying the note rather than the note itself. *See, e.g., Johnston v. Dollar*, 83 Ga.App. 219, 63 S.E.2d 408 (1951).

**8.** In *Lattimore Land*, the obligor asserted fraud in the inducement as a defense to an FDIC action to collect on the note. The court, however, did not reach the issue whether 12 U.S.C. § 1823(e) protected the FDIC from such fraud claims, because the court found that the misrepresentations alleged did not support an action for fraud under Georgia law. *Lattimore Land, supra*, 656 F.2d at 143–46.

B. *The Defense of Federal Common Law*

1. The Rule

Although we conclude that the specific language of § 1823(e) does not protect the FDIC from the Gunters' allegations, we agree with the trial court that principles of federal common law protect the FDIC from ordinary fraud claims of which it lacks knowledge.

Any analysis of federal common law must begin with the seminal Supreme Court case on the subject, *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). *Kimbell Foods* dealt with the law governing priority of liens created by Small Business Administration and Farmers Home Administration loans. The SBA and FHA had argued that the priority of their liens was governed by federal, not state, law and that a uniform federal rule of first priority was necessary to protect federal interests.

The Supreme Court adopted a two-part analysis for determining the applicable law. First, the Court decided whether federal law applied at all to the SBA and FHA. The Court noted that it had "consistently held that federal law governs questions involving the rights of the United States arising under nationwide federal programs," and that:

> "When the United States disburses its funds or pays its debts, it is exercising a constitutional function or power . . . The authority [to do so] had its origin in the Constitution and the statutes of the United States and was in no way dependent on the laws [of any State]. The duties imposed upon the United States and the rights acquired by it . . . find their roots in the same federal sources. In absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards."

*Id.* at 726, 99 S.Ct. at 1457 (quoting *Clearfield Trust Co. v. United States*, 318 U.S. 363, 366–67, 63 S.Ct. 573, 574–75, 87 L.Ed. 838 (1943)). Because the SBA and FHA "derive[d] their authority to effectuate loan transactions from specific Acts of Congress passed in the exercise of a 'constitutional function or power,'" the Court held that federal law controlled the rights of the agencies. *Id.* at 726–27, 99 S.Ct. at 1457–58.

Having determined that federal law was applicable, the Court moved to the second step in its analysis: giving content to this law. The Court reasoned that federal law does not always require a uniform federal rule, and that the decision on whether to formulate a uniform federal rule or adopt state law as the federal rule of decision hinged on balancing three factors: whether the federal program was one which by its nature required nationwide uniformity, whether adopting the state law would frustrate the specific objectives of the federal program, and whether applying a federal rule would disrupt commercial relations predicated on state law.

Applying this analysis to the SBA and FHA, the Court concluded that a uniform rule of federal law was unnecessary. The Court acknowledged that adopting a state rule would not interfere either with a need for uniformity or federal objectives. The loan programs in question had already adopted state law in their operating practices, and because each loan application was already heavily scrutinized for credit-worthiness, no significant delay in loan processing would result from adopting state priority rules. Moreover, unlike the federal tax lien situation, in which the United States was an involuntary creditor with no prior opportunity to protect its interest, the voluntary loan programs of the SBA and FHA provided ample opportunity for the agencies to verify the priority of their liens under state law. Finally, the Court noted that adopting a uniform rule of first priority for voluntary federal loan programs would significantly interfere with the settled expectations of other lienholders under state law. As a result, the Court held that state law embodied in the Uniform Commercial Code was an appropriate substantive law for these cases.

Since *Kimbell Foods*, the federal courts have been reluctant to fashion new rules of federal law when state rules of decision provided adequate protection for federal interests. The former Fifth Circuit, for example, twice held in cases involving the SBA that state rules of decision were the proper basis for federal law governing the rights of the agency. In *United States v. S. K. A. Associates, Inc.*, 600 F.2d 513 (5th Cir. 1979), the court followed the *Kimbell Foods* analysis in holding that the Florida rule of priority for a landlord's lien over a perfected security interest controlled a suit by the SBA. Similarly, in *United States v. Dismuke*, 616 F.2d 755, 758–59 (5th Cir. 1980) the court held that the Georgia rule prohibiting suit for a deficiency judgment unless the prior foreclosure sale had been judicially confirmed within thirty days of the sale applied to the SBA.

In both *S. K. A. Associates* and *Dismuke*, the court stressed the Supreme Court's emphasis in *Kimbell Foods* on the fact that adoption of state law would not hinder the administration of the SBA loan programs and on the SBA's ability to protect its interests through the loan approval procedure. *See Dismuke, supra*, 616 F.2d at 759. In contrast to these cases, other federal courts have fashioned special uniform federal rules when necessary to protect important federal interests. In *United States v. Pisani*, 646 F.2d 83 (3d Cir. 1981), for example, the court confronted the problem of whether the sole stockholder of a nursing home corporation would be personally liable for repaying Medicare overpayments to the corporation. The court held that a uniform federal rule governing the "piercing of the corporate veil" should displace state law when medicare overpayments were at issue in order to protect the federal interests behind the Medicare program.[9]

Given this background, we conclude, as did the trial court, that the principles delineated in *Kimbell Foods* mandate adopting a uniform rule of federal law to protect the FDIC from fraud claims of which it lacked knowledge. The first step in the analysis, determining whether federal law applies in the first instance, need not long detain us. Aside from the fact that the Supreme Court has already held in *D'Oench, Duhme, & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) that federal law controls the rights and obligations of the FDIC, the FDIC operates under authority derived from a specific statutory scheme passed by Congress in exercise of a "constitutional function or power" to protect and stabilize the national banking system. Hence, federal law applies.

The substance of the federal rule requires more extensive analysis. Two of the three factors enumerated in *Kimbell Foods* weigh heavily in favor of protection for the FDIC. First, the nature of the FDIC as insuror for a variety of banks across the country and the necessity for overnight decisions in dealing with a failed bank requires a uniform federal rule governing the FDIC's rights. Unlike the loan programs of the SBA and FHA, which provided ample opportunity for federal officials to ascertain the impact of state law on loan decisions, decisions concerning the appropriate method of dealing with a bank failure must be made with extraordinary speed if the going concern value of the failed institution is to be preserved. Subjecting the FDIC to the additional burden of considering the impact of possibly variable state law on the rights involved could significantly impair the FDIC's ability to choose between the liquidation and purchase-and-assumption alternatives in handling a bank failure.

By far the most persuasive reason for adopting a federal rule of non-liability for

---

9. Specifically, the court found that to promote prompt treatment of Medicare patients, HEW had to pay for Medicare services without investigating actual costs and financial condition of the provider of the medical services prior to the payments. To avoid the possibility that doctors would use "dummy" corporations to avoid repaying Medicare overpayments, thus damaging the overall Medicare program, a federal rule of piercing the corporate veil was necessary. The court also noted that unlike the SBA loan programs, the Medicare program required nationwide uniform rules of law.

fraud claims, however, is the fact that the absence of such a rule would make the FDIC's task of executing its statutory mandate under the first paragraph of § 1823(e) nearly impossible. That paragraph reads:

> Whenever in the judgment of the Board of Directors such action will reduce the risk or avert a threatened loss to the Corporation and will facilitate a merger or consolidation of an insured bank with another insured bank, or will facilitate the sale of the assets of an open or closed insured bank to and assumption of its liabilities by another insured bank, the Corporation may, upon such terms and conditions as it may determine, make loans secured in whole or in part by assets of an open or closed insured bank, which loans may be in subordination to the rights of depositors and other creditors, or the Corporation may purchase any such assets or may guarantee any other insured bank against loss by reason of its assuming the liabilities and purchasing the assets of an open or closed insured bank. Any insured national bank or District bank, or the Corporation as receiver thereof, is authorized to contract for such sales or loans and to pledge any assets of the bank to secure such loans.

Under the above paragraph, the FDIC may enter into a purchase and assumption transaction only "whenever in the judgment of the Board of Directors such action will reduce the risk or avert a threatened loss to the Corporation ..." To make this statutory judgment, the FDIC must have some method to evaluate its potential liability in a purchase and assumption versus its potential liability from a liquidation. Because of the time constraints involved, the only method of evaluating potential loss open to the FDIC is relying on the books and records of the failed bank to estimate what assets would be returned by a purchasing bank and to estimate which of those assets

ultimately would be collectible. The Corporation can then compare its estimated loss from a purchase and assumption against its estimated loss from a liquidation and make the statutory judgment required under § 1823(e).[10]

If the FDIC's right to collect on returned assets, however, were subject to fraud claims of which the FDIC lacked knowledge, estimating its potential loss from a purchase and assumption would be impossible. The Corporation could not predict from the bank records which assets would likely be collectible and which would be subject to unknown claims of fraud. Consequently, the FDIC could not make the judgment necessary under § 1823(e) and the purchase and assumption method of handling bank failures would be effectively foreclosed.

■ Such a result would run directly counter to the policies behind the creation of the FDIC. As many courts have recognized, these policies are promoting the stability of and confidence in the nation's banking system. *E.g., First State Bank v. United States,* 599 F.2d 558, 562 (2d Cir. 1979), *cert. denied,* 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642 (1980); *FDIC v. Godshall,* 558 F.2d 220, 221 (4th Cir. 1977); *Doherty v. United States,* 94 F.2d 495, 497 (8th Cir.), *cert. denied,* 303 U.S. 658, 58 S.Ct. 763, 82 L.Ed. 1117 (1938). As discussed in Part I of this opinion, *supra,* a purchase and assumption is often the best method of promoting these goals because it avoids the spectre of closed banks and the interruption of daily banking services. Adopting a state rule of law which would permit asserting unknown fraud claims against the FDIC, therefore, would significantly interfere with the federal policies behind the FDIC.

The Gunters attempt to counter this analysis with two arguments. First they assert that the placement of the first comma in the initial sentence of § 1823(e) requires an

---

**10.** The maximum liability of the FDIC in a liquidation is fixed by the $100,000-per-depositor insurance limitation. In a purchase and assumption, however, the FDIC agrees to repurchase any unacceptable assets from the purchasing bank and cannot rely on the statu-tory limitation of its liability. Hence to make the statutory judgment under § 1823(e), the FDIC must have some method of estimating its potential liability under a purchase and assumption to compare it to the maximum liability in a liquidation.

interpretation that the FDIC can select a purchase and assumption either (1) when the risk of loss will be no greater than a liquidation and the purchase and assumption will facilitate a merger or consolidation with another insured bank or (2) the purchase and assumption would facilitate a sale of assets to and assumption of liabilities by another insured bank. According to the Gunters, under this interpretation the FDIC need not make any judgment concerning its potential loss unless the purchase and assumption results in a merger or consolidation as opposed to a simple sale of assets. Because a purchase and assumption rarely results in a merger or consolidation, the argument continues, adoption of state fraud rules would not impair the FDIC's use of the purchase and assumption device.

■ This interpretation of § 1823(e) is untenable. The absorption of one corporation by another through a sale of assets/assumption of liabilities is substantively similar to achieving the same result by merger or consolidation,[11] and none of the three devices bears any relation to the liability incurred by the FDIC. It is illogical, therefore, to hold that Congress intended the FDIC to make a risk assessment before arranging a purchase and assumption which resulted in a merger, but not when the purchase and assumption facilitated a sale of assets/assumption of liabilities. Thus we conclude that § 1823(e) requires a risk assessment by the FDIC regardless of the device used by the purchasing bank to absorb the failed bank.

■ The Gunters second argument is that regardless of the statutory language in § 1823(e), the FDIC does not in fact determine whether its losses under a purchase and assumption will be no greater than in liquidation. To support this contention the Gunters assert that the purchase and assumption in this case cost the FDIC more than a liquidation would have.[12] We need not determine whether the Gunters' arithmetic is correct, however, because we find that their argument suffers from two fundamental misconceptions. First, the ultimate liability of the FDIC will not be known until it has completed its attempts to collect on the assets returned by First Tennessee. Second, the statute does not require that the FDIC know its ultimate losses to the last cent before selecting a purchase and assumption. Rather, § 1823(e) requires a reasoned judgment that the risk of a purchase and assumption is not greater than a liquidation. The statute permits error; hence the mere fact that in a particular case the FDIC's final liability in a purchase and assumption exceeds that of a liquidation does not warrant the inference that the FDIC is ignoring its statutory mandate.[13]

The necessity for an assessment of risk under § 1823(e), however, is not the only reason for concluding that adopting state law in this situation would frustrate federal policy. As the former Fifth Circuit noted in *FDIC v. Lattimore Land Co.*, 656 F.2d 139, 146 n.13 (5th Cir. 1981), if an obligor could assert that the failure of a bank to

11. State business corporation laws, for example, generally treat a sale of all the assets of a corporation in the same manner as a merger or consolidation. *See, e.g.*, Ga.Code Ann. §§ 22–1003 and 22–1102 (requiring shareholder approval of a merger, consolidation, or sale of assets); Ga.Code Ann. § 22–1201 (giving shareholders right to dissent from merger, consolidation, or sale of assets).

12. The Gunters assert that at closing Chattanooga Hamilton had $336,000,000 in deposit liabilities, of which approximately $128,000,000 were not insured. Hence the FDIC in a liquidation initially would have paid out $208,000,000 but received a proportionate share of the assets amounting to approximately $170,000,000. According to the Gunters, therefore, the net loss

to the FDIC would have been $38,000,000, considerably less than the $54,000,000 the FDIC paid pursuant to the purchase and assumption. These calculations, however, fail to account for interest lost on the initial payout of $208,000,-000 and expenses of collecting the $170,000,000 in assets which were saved by the purchase and assumption.

13. We also note that the sale agreement between the FDIC as receiver and FDIC as insuror specifically recited that the board of directors of the Corporation had found that the purchase and assumption would reduce the risk and avert a threatened loss to the insurance fund.

perform certain promises constituted fraud and grounds for rescission, the obligor would successfully thwart the "no agreement" protection of § 1823(e) "by asserting as fraudulent the same unwritten agreement of which a breach . . . may not under § 1823(e) be asserted against the FDIC." Moreover, we note that the Supreme Court itself in the past has recognized a federal policy for protecting the FDIC, albeit in a more limited manner. *See D'Oench, Duhme, & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).[14]

The final *Kimbell Foods* factor, the effect of a federal rule on settled commercial expectations under state law, is more equivocal. The Gunters strongly argue that this court should not upset the settled rules of commercial paper permitting assertion of fraud claims against one not a holder in due course in favor of a special rule for the FDIC. Unlike loan priority, however, which lenders rely on daily in processing loan applications, we doubt that the eventuality of a bank failure plays a significant role in the ordinary commercial expectations of the parties to negotiable instruments. In fact, the reason the FDIC was not a holder in due course here is because the Gunter note was not transferred in the ordinary course of business. Had the bank not failed but instead transferred the note in the ordinary course of business to another institution for value, in good faith, and without knowledge of the fraud, the transferee would have taken the note as a holder in due course, free from the fraud claims.

Inasmuch as the notes contained no transfer restrictions, the latter prospect was likely more within the commercial expectations of the parties than the failure of the Hamilton banking system. The Gunters, therefore, are in no worse position under a federal rule protecting the FDIC than they would have been had Chattanooga Hamilton transferred the note to another banking institution in the ordinary course of business. Protecting the FDIC, moreover, does not leave the Gunters without a remedy; they may still pursue their action against the wrongdoers, the officers and directors of Chattanooga Hamilton. We conclude, therefore, that the potential damage to commercial expectations of a federal rule of non-liability for unknown fraud claims is far outweighed by the interference with the federal goals of stability and confidence in the national banking system that would result from permitting such claims.

Having found that the *Kimbell Foods* analysis mandates a uniform federal rule prohibiting the assertion of fraud claims against the FDIC when the fraud was unknown to the FDIC, we proceed to circumscribe the boundaries of our decision. First, because this rule is based largely upon the need for quick decisions by the FDIC regarding the method to best handle a bank failure, the rule applies only when the FDIC acquires a note in the execution of a purchase and assumption transaction. In other, more normal, commercial contexts, we see no reason to relieve the FDIC from

---

**14.** In *D'Oench* the obligor had sold the bank bonds which had defaulted. To permit the bank to avoid showing the defaulted bonds on its books, the obligor gave the bank notes with the secret understanding that the notes would never be repaid. When the FDIC acquired the notes in a purchase and assumption, it sued for payment. The Supreme Court held that federal law applied to the question of the obligor's liability on the notes and that given the federal policy to protect the FDIC from misrepresentations designed to influence its actions and the fact that the petitioner had lent itself to a scheme to mislead the FDIC, petitioner was estopped to deny its liability on the note.

Although *D'Oench* went no further than to enforce the liability of one who had "lent himself" to a scheme to defraud, the case provides

a general basis for a federal policy to protect the FDIC. Moreover, *D'Oench* itself was an extension of the principles first articulated in *Deitrick v. Greaney*, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694 (1940), in which the Court upheld the liability of an obligor on a note executed "for the express purpose of deceiving the [FDIC] on insurance of the bank ..." *D'Oench, supra*, 315 U.S. at 457, 62 S.Ct. at 679. Finally, although both *Deitrick* and *D'Oench* required an element of fault on the part of the obligor, § 1823(e), which was the Congressional response to the *D'Oench* holding, eliminated any fault requirement. These events chronicle a broadening protection for the FDIC founded on federal policies of protecting the banking system, and we think support our federal common law holding.

the ordinary operation of state law. Second, because another primary basis of the rule is the need for the FDIC to rely on the books and records of the failed bank in assessing its potential liability under a purchase and assumption vis-a-vis a liquidation, the protection from unknown fraud is available only to the extent the FDIC pays value for the note and thereby jeopardizes a portion of the insurance fund. Finally, we require that the FDIC have taken the note in a good-faith execution of its part of the purchase and assumption transaction.

■ Accordingly, we hold that as a matter of federal common law, the FDIC has a complete defense to state and common law fraud claims on a note acquired by the FDIC in the execution of a purchase and assumption transaction, for value, in good faith, and without actual knowledge of the fraud at the time the FDIC entered into the purchase and assumption agreement. We note, moreover, that the rule we adopt today is in accord with similar decisions by other federal courts. *See, e.g., FDIC v. First Southern Trust Co.,* Nos. 80–1139 and 80–1367 (6th Cir. Jan. 13, 1982) and *Gilman v. FDIC,* 660 F.2d 688 (6th Cir. 1981) (holding that when FDIC acquired a note in good faith, for value, and without actual knowledge that the note was executed in violation of the securities laws, the FDIC took the note free from securities law fraud claims); *FDIC v. Rockelman,* 460 F.Supp. 999 (E.D.Wis.1978) (holding that § 1823(e) impliedly gives the FDIC rights of a holder in due course).[15]

## 2. Defenses to the Rule

Having decided that when the FDIC acquires a note in a purchase and assumption

transaction for value, in good faith, and without actual knowledge of the claims of fraud, it takes the note free of those claims, we must assess whether the FDIC has met the requirements of the rule in this case.

■ We note initially that here the FDIC unquestionably acquired the note in the execution of a purchase and assumption transaction and paid value for it. The Gunters, moreover, do not claim that the FDIC had actual knowledge of the fraud claims at the time of the purchase and assumption transaction. As part of their argument relating to the securities law fraud claims, however, the Gunters strongly assert that the "intrafamily" transfer of the note from the FDIC as receiver to the FDIC as corporate insuror was a sham transaction which cannot meet a "good faith" requirement.

We have no quarrel with the many cases cited by the Gunters holding that intracorporate transfers of commercial paper cannot cut off defenses of the maker. Unlike private corporations, however, the FDIC is not structured for its own convenience. Rather, the division of authority between the FDIC as receiver and FDIC as corporate insuror is statutorily mandated in the Federal Deposit Insurance Corporation Act. One entire section of the Act, for example, sets standards for the Corporation as receiver. 12 U.S.C. § 1822. Section 1823(d), moreover, clearly contemplates transactions between the FDIC as receiver and FDIC as corporate insuror, stating "receivers or liquidators of insured banks . . . shall be entitled to offer the assets of such banks for

15. The Gunters argue that the Ninth Circuit's decision in *FDIC v. Meo,* 505 F.2d 790 (9th Cir. 1974) contradicts our holding. In *Meo* the obligor had executed a promissory note to the San Francisco National Bank (SFNB) to acquire part ownership of 1000 shares of the bank's stock. Instead of properly executing the order, SFNB directed its brokers to issue 1000 voting trust certificates. Appellant never became aware of the deception because SFNB held the certificates as security for the loan. When the bank became insolvent, the FDIC was appointed receiver and sued on the note, asserting that the policies delineated in *D'Oench* protected it

from claims of breach by the obligor. The Ninth Circuit, noting that *D'Oench* applied only to secret agreements, held that because the appellant here had not in any way been involved in a scheme to defraud, he had a defense to the FDIC's action.

*Meo,* however, dealt only with the FDIC as *receiver* not as corporate insuror. *See id.* at 791. Because the rule of federal common law we adopt today is limited to a purchase of assets by the FDIC as insuror pursuant to a purchase and assumption, *Meo* is not directly contradictory to our holding.

sale to the Corporation...." In light of this Congressionally-mandated division of authority, we cannot hold that the transfer of the Gunter note according to the statutory procedure was not a good-faith transaction. Such a holding would call into question the propriety of a variety of routine intergovermental transactions which unquestionably are conducted in good faith. We recognize that the Gunters in this case made a strong factual record concerning FDIC operations in Chattanooga showing that the FDIC did not maintain separate offices for its receiver and insuror capacities, and that the same FDIC personnel who acted for the FDIC as receiver also acted for the FDIC as corporate insuror. The record, however, also shows that the FDIC was fully aware of its dual capacity in executing the purchase and assumption transaction. The parties to the purchase and assumption, for example, executed two separate agreements to facilitate the transaction: one between First Tennessee and the FDIC as receiver, and a second between the FDIC as receiver and the FDIC as corporate insuror.

Finally, we note that other federal courts have recognized that under the statute the FDIC may act in a dual capacity. *FDIC v. Ashley*, 585 F.2d 157 (6th Cir. 1978); *FDIC v. Godshall*, 558 F.2d 220 (4th Cir. 1977); *FDIC v. Glickman*, 450 F.2d 416, 418 (9th Cir. 1971); *Freeling v. Sebring*, 296 F.2d 244, 245 (10th Cir. 1961). In *Ashley* and *Godshall*, moreover, the courts held that transactions between the FDIC as receiver and FDIC as corporate insuror were bona fide transactions. *Ashley, supra*, 585 F.2d at 160–62; *Godshall, supra*, 558 F.2d at 222–23.[16] *See Gilman v. FDIC*, 660 F.2d 688, 695 n.11 (6th Cir. 1981) (sale of note by FDIC as receiver to FDIC as corporate insuror satisfies "good faith" criterion of the innocent purchaser defense of § 29(c) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(c)). We conclude, therefore, that the FDIC as corporate insuror acquired the Gunter note as part of a good faith sale of that note by the FDIC as receiver, for value, and without actual knowledge of the Gunters' claims of fraud. Accordingly, we affirm the district court's grant of summary judgment in favor of the FDIC on the Gunters' state and common law fraud claims.[17]

### III. The Federal Securities Laws Claims

Although the district court held that a rule of federal common law protecting the FDIC from state and common law fraud claims also prohibited a rescission action for securities law violations,[18] we decline to extend the rule so far. While adopting state law as to the fraud claims would frustrate the federal policies of promoting stability of and confidence in the banking system and thus must give way to a uniform federal rule, we are less confident that these federal policies behind the FDIC Act outweigh the strong policies of investor protection embodied in the securities laws. We need not decide which policies are strongest, however, because we find that the Gunters' securities claims against the FDIC are barred by the defense in § 29(c) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(c).

### A. The § 29 Defense

■ Section 29(c) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(c), states:

> FDIC as receiver in good faith for value and hence was suing in its corporate capacity was essential to the holding that federal courts had jurisdiction under 12 U.S.C. § 1819.

**16.** Appellants correctly note that the primary issue in both *Ashley* and *Godshall* was whether the federal courts had jurisdiction over the action, not the liability of an obligor on a note. Under 12 U.S.C. § 1819, however, a federal court has no jurisdiction over an action by the FDIC if the FDIC is acting only as receiver of a state bank. Thus in each case in order to find jurisdiction, the courts necessarily had to find that the FDIC was suing on obligations in its own right rather than as receiver. Therefore, the finding by the court that the FDIC as corporate insuror had purchased the notes from the

**17.** Although our discussion in part II of this opinion has been cast in terms of ordinary fraud, it applies as well to the Gunters' state securities laws fraud claims, which are also barred by the federal law defense we adopt today.

**18.** See note 6, *supra*.

(c) Nothing in this chapter shall be construed (1) to affect the validity of any loan or extension of credit (or any extension or renewal thereof) made or of any lien created prior or subsequent to the enactment of this chapter, unless at the time of the making of such loan or extension of credit (or extension or renewal thereof) or the creating of such lien, the person making such loan or extension of credit (or extension or renewal thereof) or acquiring such lien shall have actual knowledge of facts by reason of which the making of such loan or extension of credit (or extension or renewal thereof) of the acquisition of such lien is a violation of the provisions of this chapter or any rule or regulation thereunder, or (2) to afford a defense to the collection of any debt or obligation or the enforcement of any lien by any person who shall have acquired such debt, obligation, or lien in good faith for value and without actual knowledge of the violation of any provision of this chapter or any rule or regulation thereunder affecting the legality of such debt, obligation, or lien.

The FDIC asserts that the Corporation acquired the Gunters' note for value, in good faith and without actual knowledge of the Gunters' claims; hence it has an absolute defense to the rescission action. Because the elements of the § 29(c) defense are identical to the elements of the federal common law defense adopted in part II B of this opinion, we agree with the FDIC's position in accordance with our discussion in part II B 2 of this opinion, *supra.*

The Gunters' arguments against the application of § 29(c) are without merit. First they assert that the FDIC did not acquire the note in good faith because the note was purchased by the FDIC as corporate insuror from the FDIC as receiver. As we held above,[19] however, the statutory division of capacity for the FDIC makes a transfer between the FDIC as corporate insuror and the FDIC as receiver a bona fide, good faith transaction.

Second, the Gunters urge that because § 29(c) is a limitation on the language of § 29(b), which according to the Gunters embodies the common-law concept of illegal bargain, *see Occidental Life Insurance Co. v. Pat Ryan & Assoc., Inc.,* 496 F.2d 1255, 1265–67 (4th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974), § 29(c) must also embody common-law concepts. Specifically, the Gunters claim that these common-law concepts include a requirement that the holder acquire the debt "in the ordinary course of business," and that "notice" of a claim is sufficient to take a party out of the § 29 defense despite the "actual knowledge" language of the statute. Since the FDIC did not acquire the Gunter note "in the ordinary course of business" but as part of a purchase and assumption, the Gunters contend that § 29(c) does not apply. Moreover, the Gunters note that by making an allowance for return of "unacceptable" assets in the purchase and assumption agreement, the FDIC had notice of the possible uncollectability of the Gunter note.

We reject these contentions. The cases relied on by the Gunters to support their "illegal bargain" argument all involve interpreting the clause of § 29(b) which states "Every contract made in violation of any provision of this chapter ... shall be void ...." The cases go no further than to say that "void" may be interpreted as "voidable" in order to assure that the party who has violated the securities laws cannot escape liability under the contract if the victim of the violation insists on enforcement, or if such an interpretation is necessary to avoid other inequities unintended by Congress. *See Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 387–88, 90 S.Ct. 616, 623, 24 L.Ed.2d 593 (1970), *Occidental Life Insurance Co., supra,* 496 F.2d at 1266–67; *Pearlstein v. Scudder & German,* 429 F.2d 1136, 1149 (2d Cir. 1970) (Friendly, J., dissenting).

In contrast to the sound policy reasons for the judicial limitation on the "void" language of § 29(b), no countervailing rea-

---

**19.** See part II B 2 of this opinion, *supra.*

sons exist to limit the express protection afforded innocent purchasers of debt securities by § 29(c). The tension between the statutory "void" language and the possibility of granting a windfall to a wrongdoer which prompted the judicial interpretations of § 29(b) is absent under § 29(c), which controls the relative rights of two innocent parties. Moreover, the statute specifically enlarges the common-law protection of innocent purchasers by requiring "actual knowledge" in place of the more lenient "notice" standard of the U.C.C. and state holder-in-due-course statutes. *See, e.g.,* U.C.C. § 3–302; Ga.Code Ann. § 109A–3–302. Given that Congress expanded the protection of § 29(c) beyond the common law and given the absence of any compelling policy mandating a contrary result, we conclude that § 29(c) does not embody the common-law limitations urged by the Gunters.[20]

*B. Application of the § 29 Defense to Claims Under § 17(b) of the Securities Act of 1933*

■ The Gunters' final argument is that even if their claims under the Exchange Act are barred by § 29(c), this defense is unavailable for claims asserted under § 17(a) of the Securities Act of 1933.[21] The Gunters contend that the specific language of § 29(c)—"Nothing in *this chapter . . .*"—

limits the operation of that section to the Exchange Act alone.

We reject this argument. Despite the limiting language used in several sections of the 1934 Act, courts have construed the 1933 and 1934 Acts *in pari materia* as a single comprehensive regulatory scheme. *See Tullis v. Kohlmeyer & Co.,* 551 F.2d 632, 634–38 (5th Cir. 1977); *Ballard & Cordell Corp. v. Zoller and Danneberg Exploration, Ltd.,* 544 F.2d 1059, 1066 (10th Cir. 1976), *cert. denied,* 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1060 (1977); *Axelrod & Co. v. Kordich, Victor & Neufeld,* 451 F.2d 838, 843 (2d Cir. 1971); *Globus v. Law Research Service, Inc.,* 418 F.2d 1276, 1286–87 (2d Cir. 1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970). *Tullis* and *Axelrod,* for example, involved claims by the plaintiffs that arbitration clauses in their New York Stock Exchange membership agreements violated the non-waiver provisions of the 1933 and 1934 Acts, 15 U.S.C. §§ 77n, 78cc(a).[22] The courts held that § 28(b) of the 1934 Act[23] overcame the waiver provisions of both the 1933 and 1934 Acts despite the fact that the 1933 Act had no provision comparable to § 28(b) and § 28(b) was by its terms limited to the 1934 Act. The courts reasoned that because the waiver provisions of each Act were similar, permitting arbitration under one but not

---

**20.** Of course, if a transaction is actually a sham, then the "good faith" element of the defense is lacking and § 29 would not apply.

**21.** Neither the Supreme Court, the former Fifth Circuit, nor the Eleventh Circuit has decided whether an implied private right of action exists for a violation of § 17(a) of the 1933 Act. The parties, however, have not raised this issue on appeal and it is not before us. Our discussion in this section, therefore, assumes without deciding that such an action is available. For an excellent summary of the current state of the law relating to implied private rights of action under § 17(a), see *Hill v. Der,* 521 F.Supp. 1370 (D.Del.1981).

**22.** 15 U.S.C. § 77n states:

Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void.

15 U.S.C. § 78cc(a) states:

Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void.

**23.** § 28(b), 15 U.S.C. § 78bb(b) states:

(b) Nothing in this chapter shall be construed to modify existing law with regard to the binding effect (1) on any member of or participant in any self-regulatory organization of any action taken by the authorities of such organization to settle disputes between its members or participants, (2) on any municipal securities dealer or municipal securities broker of any action taken pursuant to a procedure established by the Municipal Securities Rulemaking Board to settle disputes between municipal securities dealers and municipal securities brokers, or (3) of any action described in paragraph (1) or (2) on any person who has agreed to be bound thereby.

the other would be illogical. Similarly, in *Globus* the court held that the statutory prohibition on punitive damages in § 28(a) of the 1934 Act, 15 U.S.C. § 78bb(a), should apply to actions brought under § 17(a) of the 1933 Act, despite the lack of a comparable damage limitation in the 1933 Act.

Although, as the Gunters note, the 1933 and 1934 Acts do not overlap completely, and certain rights may be available under one Act which are not available under the other,[24] in this case the Gunters' claims under the 1933 and 1934 Acts are all based on the same fraud-misrepresentation theory. Consequently we conclude that permitting an action to go forward under the 1933 Act, which does not specifically provide for a private right of action, while holding that identical claims under the 1934 Act are barred by the defense of § 29(c), would create a dichotomy between the two Acts that was not intended by Congress and that would be counter to the express protection of innocent purchasers in § 29(c). Hence we hold that assuming the Gunters may bring an action under § 17(a) of the 1933 Act,[25] that action in this case is barred by the defense in § 29(c) of the 1934 Act.

## IV. Summary

In summary, we hold that the Gunters' state and common-law fraud claims are not barred by the "no agreement" language of 12 U.S.C. § 1823(e), but are barred by a federal rule of common law protecting the FDIC from such claims when it acquires a note in execution of a purchase and assumption transaction, in good faith, for value, and without actual knowledge of the claims at the time of entering into the purchase and assumption. Although we decline to extend this protection to claims of federal securities laws violations in this case, we find that here the FDIC has a valid defense to those claims under § 29(c)

of the Securities Exchange Act, 15 U.S.C. § 78cc(c). Accordingly, the district court's grant of summary judgment in favor of the FDIC is affirmed.

AFFIRMED.

---

24. For example, section 5(a) of the 1933 Act renders unlawful the selling of unregistered securities, absent an exemption. 15 U.S.C. § 77e(a). Section 12(1) of the 1933 Act, 15 U.S.C. § 77*l*(1), gives one who purchases a security sold in violation of section 5(a) a right to rescind the transaction or to recover damages if he has sold the security. The 1934 Act has no comparable provision. On the other hand, section 16(b) of the 1934 Act, 15 U.S.C. § 78p, directed at trading on the basis of inside information, is a unique express liability provision with no counterpart in the 1933 Act.

25. See note 19, *supra.*