862 F.2d 1252
 SUPER X DRUGS CORPORATION and Hook-Super X, Inc.,
Plaintiffs-Appellants, Cross- Appellees,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION in its corporate
capacity, and Sally C. Bradley, Substitute
Trustee, Defendants-Appellees (87-5644),
Federal Deposit Insurance Corporation,
Defendant-Cross-Appellant (87-5912).
 Nos. 87-5644, 87-5912.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 13, 1988.
Decided Dec. 6, 1988.
 
 Courtney N. Pearre, argued, Heiskell, Donelson, Bearman, Adams, Williams and Kirsch, William S. Lockett, Jr., Knoxville, Tenn., for plaintiffs-appellants, cross-appellees.
 Michael E. Tucci, argued, D. Michael Trannum, F.D.I.C., Knoxville, Tenn., Geoffrey S. Kranz, for defendants-appellees.
 Before WELLFORD and BOGGS, Circuit Judges, EDWARDS, Senior Circuit Judge.
 WELLFORD, Circuit Judge.
 
 
 1
 This is yet another in a series of controversies spawned by the failure of the Butcher family banking "empire" in East Tennessee involving Federal Deposit Insurance Corporation (FDIC) in its role as receiver following insolvency of a Butcher-controlled bank. This suit by Super X Drugs Corp (Super X)[1] was filed in Tennessee state court seeking an injunction to prevent FDIC from foreclosing on property on which a Super X drug store was located in Knoxville. The case was removed by FDIC to the district court at Knoxville, which denied the injunctive relief sought. After FDIC foreclosed the subject property, Super X sought to set the foreclosure aside. Each party filed a motion for summary judgment on the essentially uncontested factual issues, and following a hearing, judgment was granted to FDIC. Super X now appeals, maintaining that (1) FDIC is not entitled to the protection of 12 U.S.C. Sec. 1823(e) under the circumstances, (2) FDIC is not entitled to rely on federal common law defenses, (3) the district court erred in relying upon evidence extrinsic to the record before it, and (4) the district court erred in holding that Super X lent itself to a transaction likely to mislead banking authorities. FDIC has cross-appealed certain aspects of the district court order.
 
 I. Background of the Dispute
 
 2
 In November 1982, Super X agreed to purchase the subject property from members of the Streck family. That property at the time was subject to a deed of trust in favor of the United American Bank in Knoxville (UAB). The deed of trust in favor of UAB was third in priority behind two other encumbrances on the Streck property. The sellers agreed with UAB to pay $50,000 for a release of the deed of trust, and a check in that amount, drawn by a title insurance concern, was given to UAB and deposited November 15, 1982. Relying on the bank's agreement to release, Super X then purchased the Streck property. In fact, however, unknown to Super X and the Strecks, UAB did not release the lien on the property. In February of 1983, Tennessee banking authorities closed UAB for irregularities and financial problems tied to the Butcher collapse and manipulations. Subsequently, there was a tendered liquidation of UAB to FDIC as receiver, which then proceeded to undertake the complex problem of selling, liquidating and realizing upon the assets of UAB. As receiver, FDIC negotiated with, and agreed to sell certain of UAB's assets to, First Tennessee National Bank (FTB).
 
 
 3
 FDIC and FTB entered into a "purchase and assumption agreement" covering the conditions of the transfer and sale, which purportedly included the note and mortgage in question on the Super X property. Subsequent to the purchase and assumption agreement, FDIC and FTB entered into two memoranda of understanding concerning UAB and its assets. FDIC, acting in its corporate capacity, finally undertook to acquire from FTB in August of 1984 a substantial number of assets covered in one or more of the previous understandings between FDIC, as receiver, and FTB, after having had an opportunity to review UAB records. The note and mortgage at issue was also a part of the transfer of former UAB assets to FDIC in its corporate capacity. Prior to this transfer, FDIC, as receiver, petitioned a Tennessee chancery court for approval of sale of these assets, and this petition was denied.
 
 
 4
 II. Was FDIC Entitled to Protection of 12 U.S.C. Sec. 1823 Under the Circumstances?
 
 
 5
 Under 12 U.S.C. Sec. 1823, FDIC is given certain protections in its role of acquiring and making disposition of failed bank properties. Before vacating that part of its order deciding the hotly contested issues in this case, the district court had first concluded that FDIC was entitled to be treated as a bona fide purchaser under Tennessee law. In its final order subject to appeal, however, the court held that FDIC was instead "entitled to the protection of Sec. 1823(e)."[2]
 
 
 6
 Plaintiff argues that because FDIC did not obtain approval from the Tennessee Chancery Court to purchase the former assets of UAB, FDIC is not entitled to protection under Sec. 1823, citing the underlined phrase in Sec. 1823(e) set out below, "under this section." The argument is that since FDIC did not acquire the deed of trust in question under Sec. 1823, then Sec. 1823(e), relied upon as a basis of holding for FDIC in this dispute, is inapplicable. Super X makes reference to Sec. 1823(d), which authorizes FDIC to purchase assets of a failed state bank such as UAB, but only after "receiving permission from appropriate state authority in accordance with express provisions of State law," something not done by FDIC in this case.
 
 
 7
 The district court determined that FDIC acquired the assets in question in August of 1984 under the following provisions of Sec. 1823(c)(2)(A):
 
 
 8
 In order to facilitate a merger or consolidation of an insured bank ... or ... the sale of assets of such insured bank and the assumption of such insured bank's liabilities by an insured institution ... the Corporation is authorized, in its sole discretion and upon such terms and conditions as the Board of Directors may prescribe--
 
 
 9
 (i) to purchase any such assets or assume any such liabilities;
 
 
 10
 (ii) to make loans or contributions to, or deposits in, or purchase the securities of, such insured institution or the company which controls or will acquire control of such insured institution;
 
 
 11
 (iii) to guarantee such insured institution or the company which controls or will acquire control of such insured institution against loss by reason of such insured institution's merging or consolidating with or assuming the liabilities and purchasing of assets of such insured bank or by reason of such company acquiring control of such insured bank; or
 
 
 12
 (iv) to take any combination of the actions referred to in subparagraphs (i) through (iii).
 
 
 13
 The district court made this ultimate finding despite noting that it "did not, at least initially, enter into a 'clean' purchase and assumption agreement" with FTB respecting UAB assets.[3] The purchase and assumption agreement involved in this case was "an unusual transaction" according to the district court, which itself had some experience in dealing with these arrangements as they applied to various other Butcher bank-FDIC involvements. It was unusual, Judge Jarvis observed, because FTB agreed with FDIC to acquire all the book assets of UAB rather than just the "good" assets as in the more typical Gunter-type arrangement. As a consequence, FDIC had agreed in Sec. 3.2 of the agreement to "reimburse assuming bank [FTB] for any loss sustained by assuming bank in excess of $86.5 million."[4]
 
 
 14
 There appears to be little substantial dispute about the underlying findings of the district court up to this juncture; Super X, of course, disputes the ultimate conclusion that FDIC's acquisition of the note and deed of trust interest in controversy come within the purview of Sec. 1823(c)(2)(A). Super X points to another case decided by the same district judge involving similar underlying facts and other former UAB assets, F.D.I.C. v. Video Expo, Inc., et al., No. 3-84-869, (E.D.Tenn. Aug. 7, 1987), in which the district court held that Sec. 1823(c)(2)(A) did not apply, because FDIC was not authorized to "alter the form of the purchase and assumption transaction ... after the bank failure," and where "loss assistance had not yet been paid." Unlike the situation in Video Expo, the district court determined that the note and deed of trust in question were purchased under the purchase and assumption agreement, and that loss assistance had been paid on these assets. The district court further noted in footnote one of its decision that "assets on which loss assistance had already been paid were simply transferred to FDIC."
 
 
 15
 Because of serious unforeseen losses entailed in the loan portfolio of UAB transferred to FTB far exceeding the specified $86.5 million loss assistance figure, FDIC agreed in August of 1984 to forego its sharing in recovery accomplished by FTB from old UAB loans and, at the same time, it was agreed that FDIC could terminate its "cost to carry" payments to FTB. These arrangements had been worked out prior to August of 1984, by two memoranda of understanding between FDIC and FTB. The district court then held that the August 1984 FDIC acquisition of these assets was pursuant to its Sec. 1823(c)(2)(A) authority. It reached this decision in consideration of the "extremely broad discretion to structure the form of a particular purchase and assumption transaction ... given the FDIC," despite the eighteen months delay between the two agreements.
 
 
 16
 As may be seen from the foregoing recitation of the underlying facts and the district court's change in the basis of its decision favoring FDIC, it was deemed crucially important by the district court to decide whether or not FDIC had purchased this note and deed of trust under the purchase and assumption agreement and that loan assistance had been paid to FTB on these particular assets. There is no dispute between the parties to this appeal that a purchase and assumption transaction was consummated between FDIC and FTB in February of 1983. The later August 8, 1984 memorandum of agreement between FDIC in its corporate capacity and FTB provided for transfer to FDIC of all assets upon which FDIC had already paid loss assistance to FTB, as well as those on which no such assistance was paid. The deed of trust at issue encumbered several parcels of Knoxville real estate in addition to the property claimed by Super X. (The deed of trust covered debts or guaranties involving Court South Knoxville, Inc. (Court South) and Tennessee Food Services, Inc. (TFS).) It is not altogether clear in the record and from the district court's decision precisely how the court determined that these assets in controversy were within the category of assets "on which loss assistance had already been paid." (See footnote one of the April 18, 1987 decision.) Based on its decision that FDIC had paid loss assistance on these assets, moreover, the district court concluded that "FTB was acting merely as a collection agent for FDIC on those particular assets," and that "FDIC would 'step into UAB's shoes' with regard to that asset under general indemnification principles." Accordingly, the district court concluded that "FDIC became at least beneficial owner of a particular asset when it paid loss assistance thereon" under the meaning of the original purchase and assumption agreement. The district court in its opinion, which is the subject of this appeal, makes no reference to Court South or to TFS debts.
 
 
 17
 It is not disputed that FDIC paid FTB approximately $621,000 in loss assistance prior to August 1984.[5] What seems to be in dispute, and the issue was raised in a motion for a limited remand filed by Super X prior to oral argument, is whether the particular note and deed of trust were among the assets for which loss assistance was in fact paid. (Super X has submitted an affidavit of Wayne Bell, a commercial loan officer of FTB, to the effect that a Court South loan was secured by several items of collateral including the deed of trust in controversy, but that he did not "value" the underlying real estate for purposes of loss assistance and that "FTB never requested Loss Assistance on the TFS debt.") The Bell affidavit goes on, however, to indicate: "[a]fter Loss Assistance for the Court South debt was approved and paid," (emphasis added) he was not contacted by FDIC regarding "valuation of the Court South collateral."
 
 
 18
 FDIC indicated in its response to interrogatories that the $50,000 certificate of deposit representing the funds paid by Super X was "ultimately applied to cover the obligation" of Court South, and it recited that other items or assets listed as collateral to secure Court South debts, including assignment of the aforesaid $50,000 certificate of deposit, were applied to Court South debts. FDIC introduced the affidavit of Mel Edmondson, head of its operation department with respect to its Knoxville liquidation office, to the effect that "FDIC paid loss assistance to First Tennessee in the approximate amount of $621,000 in early 1984 and then purchased the remainder of the note in August 1984." Presumably Mr. Edmondson was referring to the Court South note or debt for which loss assistance was purportedly paid "in early 1984."
 
 
 19
 We believe that in the interest of justice in this case the district court should indicate and clarify the basis of its determination that loss assistance was paid for the particular note and deed of trust in question or the debts for which they stood as collateral security. This is a critical finding upon which the district court then concluded that Sec. 1823(c)(2)(A) applies, and that, accordingly, FDIC must prevail.
 
 
 20
 To conserve judicial time and resources, instead of making the usual remand, we effect only a limited remand for clarification or explanation of this district court finding, amplification of the record, and/or any conclusion reached as a consequence of this clarification, explanation or amplification. This REMAND is pursuant to 28 U.S.C. Sec. 2106, and we will retain jurisdiction over the pending appeal, subject to the limited remand, regarding the payment of loss assistance for the particular note and deed of trust in question or the debts for which they were given as collateral.
 
 
 
 [1]
 Super X is a Michigan corporation. Hook-Super X is a Delaware corporation and is also a named plaintiff. Their interests in the property in question are similar and we refer to both plaintiffs collectively in this case as Super X. (Hook-Super X acquired the property from Super X in December, 1986)
 
 
 [2]
 Section 1823(e) provides:
 No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.
 (emphasis added).
 
 
 [3]
 An "ordinary" or "clean" FDIC purchase and assumption agreement is of the type described in Gunter v. Hutcheson, 674 F.2d 862 (11th Cir.), cert. denied, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982), according to the district court
 
 
 [4]
 FDIC itself entered into this agreement as receiver under Tennessee law for UAB; under the purchase and assumption agreement with FTB, FDIC had no obligation to purchase any of these assets
 
 
 [5]
 In its appellate brief, FDIC indicates at page 6 that the amount of loan assistance was $612,000. In its response to FTB's motion for limited remand, FDIC states the amount to be $621,000. (Response of May 21, 1988, at p. 2)