FEDERAL SAVINGS AND LOAN IN-
SURANCE CORPORATION, as Receiv-
er for FirstSouth, F.A., Plaintiff,

v.

W. Robert SMITH, Defendant,
Counterplaintiff and Third
Party Plaintiff,

v.

FEDERAL SAVINGS AND LOAN IN-
SURANCE CORPORATION, as Receiv-
er for FirstSouth, F.A., et al., Third
Party Defendants.

No. LR–C–88–555.

United States District Court,
E.D. Arkansas, W.D.

Oct. 31, 1989.

See also 721 F.Supp. 1039.

Dan Parker, Eichenbaum Firm, Little Rock, Ark., for Federal Sav. and Loan Ins. Corp.

Jake Lutz, Huggins & Associates, Memphis, Tenn., and Cyril Hollingsworth, Little Rock, Ark., for W. Robert Smith.

Philip Kaplan, Little Rock, Ark., for Rod Beason.

## ORDER

EISELE, Chief Judge.

Defendant borrowed some $494,000 from FirstSouth, F.A. Subsequently, defendant failed to repay the loan and the FSLIC was appointed receiver for FirstSouth, succeeding to all of FirstSouth's rights against defendant. FSLIC as receiver filed suit in this Court to collect on defendant's note. Defendant responded that he had been duped into borrowing the money for the purpose of buying now worthless First-South stock, and that this misconduct excused his duty to repay the loan. He also asserts other affirmative defenses. In addition, defendant filed a counterclaim against FirstSouth and a third party complaint against Mr. Rod Beason, seeking to recover for violations of federal and state securities law and for fraud, constructive fraud, negligence, and conspiracy. FSLIC has moved to strike the affirmative defens-

es, to dismiss the counterclaim and third-party complaint, and for summary judgment.

## CLAIMS, DEFENSES, AND COUNTERCLAIMS

The complaint is a simple one, asserting execution of a note, default, and demand. In his counterclaim, defendant alleges that FirstSouth and and third party defendant Rod Beason materially misrepresented FirstSouth's financial condition, leading defendant to buy a block of FirstSouth stock. Furthermore, defendant says he was induced to borrow from FirstSouth the money to buy the stock. FirstSouth later failed, rendering the stock worthless and leaving defendant with a claimed debt of nearly half of a million dollars to First-South.

As affirmative defenses, defendant relies upon the alleged fraudulent conduct asserted in his counterclaim and third party complaint, claiming that he is entitled to rescission, recoupment, and other affirmative relief, and that plaintiff is barred by estoppel, illegality, unclean hands, and lack of consideration. He further asserts a right of setoff for the damages asserted in the counterclaim, and finally claims that he lacked capacity at the time he signed the notes.

## REGULATORY FRAMEWORK

Absent the FSLIC's takeover of First-South, this lawsuit would be a garden variety collection case with not uncommon counter-allegations of fraud. But this case cannot be understood apart from the pervasive regulatory scheme which surrounds savings and loans. This Court's very jurisdiction is based on the fact that the FSLIC has been appointed receiver. 12 U.S.C. 1730(k)(1)(B). To make the matter even more complex, that regulatory scheme has recently undergone substantial revision as Congress responds to the industry crisis. We begin with a sketch of pertinent portions of the regulatory plan under which the FSLIC operates.

First to be reviewed is the law as it stood at the time this lawsuit was filed. The Federal Home Loan Bank Act, 12 U.S.C. 1421, et seq., created a Federal Home Loan Bank Board ("Board") which regulates Federal Savings and Loans Associations pursuant to the Home Owners' Loan Act of 1933, 12 U.S.C. 1461, et seq. The FSLIC was created in 12 U.S.C. 1724, et seq., and directed to "insure the accounts of institutions eligible for insurance" under the provisions of 12 U.S.C. 1726. 12 U.S.C. 1725(a). The FSLIC was under the direction of the Board. Id. *See generally, Coit Independence Joint Venture v. FSLIC,* 489 U.S. 561, 109 S.Ct. 1361, 1366–68, 103 L.Ed.2d 602 (1989).

The Board was empowered to appoint a conservator or receiver for any savings and loan association on any of the grounds listed in 12 U.S.C. 1464(d)(6)(A). Ordinarily, the Board was required to appoint the FSLIC as receiver for an association. 12 U.S.C. 1464(d)(6)(D). Some of FSLIC's powers and duties as receiver were set forth in 12 U.S.C. 1729(b)(1). FSLIC is authorized to take over the assets of and operate the savings and loan, to take necessary action to put the association in a sound solvent condition, to merge it with another insured institution, to organize a new association to take over the assets, to liquidate the assets, or to make such other disposition of the matter as it deems appropriate, whichever it deems to be in the best interest of the association, its savers and the FSLIC. 12 U.S.C. 1729(b)(1)(A). It was FSLIC's duty to "pay all valid credit obligations of the association." 12 U.S.C. 1729(b)(1)(B). Additional powers of FSLIC as receiver were set forth in 12 U.S.C. 1729(d), including the power to "collect all obligations to the insured institutions, to settle, compromise, or release claims in favor of or against the insured institutions, and to do all other things that may be necessary in connection therewith, subject only to the regulation of the [Board]." FSLIC brought this action pursuant to its powers as receiver. Complaint, para. 1.

The FSLIC was also authorized to take steps in its corporate capacity to assist regulated savings and loans. For example, it was empowered to make loans to, to make deposits in, to purchase the assets or securities of, to assume the liabilities of, or to make contributions to insured institu-

tions which were in default or which were threatened with default. 12 U.S.C. 1729(f)(1). FSLIC was also authorized to facilitate mergers or consolidation of institutions or the sale of assets of an institution by purchasing assets or assuming liabilities, making loans, contributions, deposits, or purchases of securities or giving guarantees. 12 U.S.C. 1729(f)(2).

The Eleventh Circuit Court of Appeals in *Gunter v. Hutcheson,* 674 F.2d 862, 865 (11th Cir.1982), cert. denied 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982), has explained the courses of action available to the FDIC when it takes over a failed bank. (The same options are available to the FSLIC.)

> As insuror one of the primary duties of the FDIC is to pay the depositors of a failed bank. The FDIC has two methods of accomplishing this duty. The simplest method is to liquidate the assets of the bank and then pay the depositors their insured amounts, covering any shortfall with insurance funds. This option, however, has two major disadvantages. First, the sight of a closed bank, even an insured one, does not promote the utmost confidence in the banking system.... To avoid the significant problems with liquidation, the FDIC whenever feasible employs a "purchase and assumption" transaction to arrange for another bank to "purchase" the failed bank and reopen it without interrupting banking operations and with no loss to the depositors. A purchase and assumption involves three entities: the receiver of the failed bank, the purchasing bank, and the FDIC as insuror. In most cases, the FDIC is appointed receiver by the appropriate banking authority and thus acts in two separate capacities, as receiver and as corporate insuror....
>
> Because the time constraints often prohibit a purchasing bank from fully evaluating its risks, as well as to make a purchase and assumption an attractive business deal, the purchase and assumption agreement provides that the purchasing bank need purchase only those assets which are of the highest banking quality. Those assets not of the highest quality are returned to the receiver, re-

> sulting in the assumed liabilities exceeding the purchased assets. To equalize the difference, the FDIC as insuror purchases the returned assets from the receiver which in turn transfers the FDIC payments to the purchasing bank.

> Whether FSLIC acts in its corporate or receivership capacity, its obligations are the same: to protect the interests of itself, the association, and the savers. Whether a particular asset remains with the association or is purchased by the corporation depends on the needs of the association for cash and the quality of the asset.

Plaintiff brings this action in its capacity as receiver for FirstSouth, not in its corporate capacity. It therefore holds the note by assignment, rather than through purchase. The consequences of that distinction will be explored further below. This summary of pertinent portions of the regulatory law applicable at the time this action was filed will suffice as a foundation for the discussion to follow.

On August 9, 1989, the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA) became law. Pertinent here are the provisions of that Act which dissolved the FSLIC and made FDIC the federal deposit insurer for banks and savings and loan associations alike. FDIC is generally given the same responsibilities as FSLIC with respect to administering insolvent associations. The other provision of FIRREA relevant to this case is the extension of 12 U.S.C. 1823(e), the scope of which is discussed below, to FDIC in its capacity as receiver.

## MOTION TO DISMISS COUNTERCLAIM

■ Defendant asserts both affirmative defenses to the collection of the note and a counterclaim sounding in deceit. These are two distinct issues: the affirmative defenses raise difficult questions as to whether—and, if so, the extent to which—personal defenses to the note are cut off by the appointment of FSLIC as receiver. The counterclaim, so far as the Court can ascertain, does not implicate any of these questions. The motion to dismiss the counter-

claim will be taken up first because it provides an appropriate context for discussion of the affirmative defenses, and because the Court takes resolution of that motion to be straightforward.

The counterclaim asserts that defendant was injured by fraud and deceit for which FirstSouth is liable. Considered strictly as a claim for securities and other types of fraud, it makes no difference whatever where the money for the stock purchase came from. If defendant had used strictly his own money and been defrauded, he would be allowed to assert his claim in a lawsuit in a court with subject matter jurisdiction. The Court does not accept plaintiff's flat assertion that "for the same reasons that [defendant's] allegations do not constitute defenses which can be raised against the Receiver, they do not constitute a basis for affirmative relief against it." Reply to Opposition, n. 1. Plaintiff appears to contend that the mere fact that the FSLIC is appointed receiver washes away fraud claims against the association. That result is precluded by *Coit Independence Joint Venture v. FSLIC*, 489 U.S. 561, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989) and by the Eighth Circuit's recent opinion in *Astrup v. Midwest Federal Savings Bank*, 886 F.2d 1057 (8th Cir.1989).

In *Coit*, the Supreme Court rejected the so-called *Hudspeth* doctrine under which the FSLIC had forced all those with claims against an association in receivership to have those claims adjudicated in administrative proceedings before the agency rather than in court. The plaintiff's claims in *Coit* were for usury and breach of fiduciary duties and duties of good faith and fair dealing, as well as a declaration that an outstanding note was unenforceable, but the Court recognized that the *Hudspeth* doctrine had been relied upon to bar court consideration of other sorts of claims, including contract and tort claims, alleged antitrust violations, and even racketeering claims. 109 S.Ct., at 1365. The Court concluded that "Congress granted FSLIC various powers in its capacity as receiver, but they do not include the power to adjudicate creditor's claims." 109 S.Ct., at 1368. Nor are claimants precluded from resorting to the courts for a determination of the validi-

ty of their claims. 109 S.Ct., at 1369. "In sum, we conclude that Congress clearly envisaged that the courts would have subject matter jurisdiction over creditor suits." 109 S.Ct., at 1371.

The rights protected by *Coit* would be severely narrowed if otherwise valid claims were nonetheless barred by the special protections extended to the FSLIC as assignee of a note. There is no logical nexus between the need to protect the FSLIC's ability to realize on its assets and injured party's right to assert claims against the institution. The Eighth Circuit made exactly this point in *Astrup* when it upheld a verdict for breach of fiduciary duty in the face of FSLIC's assertion of the *D'Oench Duhme* doctrine:

Breach of such a duty sounds in tort rather than contract, and the District Judge rightly held that it would be an extension of *D'Oench Duhme* to apply it to a tort claim. The *D'Oench Duhme* doctrine simply forbids fabrication of fictitious assets for inclusion in the accounts receivable portfolio of regulated financial institutions tending to mislead and deceive bank examiners in their investigations to determine the financial condition of such institutions. That doctrine affords no protection against tort claims against a financial institution, whether for personal injuries to a motorist in a collision with an armored car bringing money to the S. & L. office, or for insider profits in a sale of securities violating Securities and Exchange regulations, or for fraudulently entering into transactions involving discriminatory interest rates, such as the agreements alleged by the plaintiff in the case at bar.

886 F.2d, at 1059.

Plaintiff does not explain why defendant's deceit claims are nevertheless barred. How much defendant could collect on any judgment in his favor, and whether he would be entitled to setoff that judgment against any liability on the note, are different questions. But that defendant is permitted to litigate the validity of his claims seems clear. Plaintiff suggests no reason why this litigation is not the appro-

priate forum for hearing defendant's counterclaim. Whether the counterclaim is compulsory is not free from doubt because, for reasons discussed below, it is not certain whether the stock purchase should be deemed part of the same transaction or occurrence as the loan. Fed.R.Civ.P. 13(a). But it is clearly a permissive counterclaim and may be raised here. Fed.R.Civ.P. 13(b), 18(a).

## MOTION TO STRIKE AFFIRMATIVE DEFENSES

 Plaintiff's motion to strike defendant's affirmative defenses in effect asserts that the FSLIC as receiver should be treated as a holder in due course of defendant's note. If FSLIC is treated as a holder in due course, than all of defendant's "personal" defenses, including fraud in the inducement, are cut off. It may be useful to review briefly the nature of a holder in due course before turning to the merits of plaintiff's contentions.

Defendant's note appears on its face to be a negotiable instrument, i.e., a signed unconditional promise to pay a sum certain at a definite time. *See, e.g.,* Uniform Commercial Code ("UCC") 3–104. A basic principal of commercial law is that the unconditional obligation to pay money represented by the note may be separated from any related obligations between the parties, and the obligation to pay may then be assigned to a stranger to the original transaction. Under certain circumstances, the third party, the new holder of the the instrument, takes the instrument free from what are called "personal" defenses. Personal defenses are those which make the obligation voidable, as opposed to the so-called "real" defenses, which make the obligation void. *See generally,* UCC 3–305; 11 Am.Jur.2d, *Bills and Notes* sec. 652, at 714–5, sec. 690, sec. 701, sec. 715 (1963); J. White and R. Summers, *Handbook of the Law Under the Uniform Commercial Code,* sec. 14–9 (2d ed 1980); R. Braucher and R. Riegert, *Introduction to Commercial Transactions,* pp. 168–173 (1977).

The holder in due course rules are intended to facilitate transactions in negotiable instruments by protecting certain holders from defenses not apparent on the face of the instrument. *See* White and Summers, sec. 14–1; Braucher and Riegert, at 172. Thus, the rules defining holder in due course limit that status to those within the reason of the rule. The holder must take the negotiable instrument for value, in good faith, and without notice of defects or defenses. UCC 3–302(1); White and Summers, sec. 14–2. Furthermore, under the UCC, a holder does not become a holder in due course if he buys the instrument at a judicial sale or through legal process, acquires it in taking over an estate, or purchases it as a bulk transaction not in the regular course of business of the transferor. UCC 3–302(3).

FSLIC will usually not meet the requirements to be a holder in due course, whether holding as receiver or corporation. In its corporate capacity, it may have notice that the note is overdue or has been dishonored, it may have notice of defenses, and it takes as part of a bulk transaction not in the regular course of business. The very reason the FSLIC buys particular assets is that those assets are not of high quality, which generally suggests some defect in collectibility. As receiver, it would likely be subject to the same objections and, since it takes by assignment not purchase, it is not clear that it takes for value.

The FSLIC's inability to meet the holder in due course requirements is not mere happenstance. The FSLIC is not within the reason of the protections created by the rule: there is no need to encourage the FSLIC to deal in negotiable instruments. To call FSLIC a sort of holder in due course is merely a shorthand way of saying that defenses based on facts not reflected in the association's records are cut off.

There is a large body of case law discussing the rights of debtors and the FSLIC in its corporate and receivership capacities, but this Court believes it can rule on FSLIC's motion based upon two Supreme Court decisions, a federal statute, and a recent Eighth Circuit decision. What these decisional materials suggest is that the interest of the regulatory body in accurately evaluating the assets of a regulated association are of sufficient weight that debtors

will not be allowed to assert defenses of the sort defendant seeks to raise. This rule is a specific application of the general legal principle that when a harm must fall on one of two innocent parties, it will be inflicted on the party who could have best protected himself. Defendant signed a facially unconditional note with FirstSouth. He thereby placed himself at risk that if FirstSouth went into receivership, the note would be enforced as written.

The first Supreme Court decision is *D'Oench Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). In that case, defendant signed a demand note which was acquired by FDIC. When FDIC sued to collect on the note, the debtor defended on the basis that the it was a sham, carried on the books of the bank to conceal certain defaulted bonds, and that the bank had promised not to call it. 315 U.S., at 454, 62 S.Ct., at 678. This side agreement was not reflected in bank records and was unknown to FDIC at the time it initiated suit. *Id.* FDIC argued that the debtor was estopped to raise defenses based on the promise not to call the note because FDIC was a holder in due course.

The Court first decided that federal rather than state law governed the outcome of the case. 315 U.S., at 456, 62 S.Ct., at 679. The outcome on the merits was suggested by an earlier case, which had held that one who knowingly makes false representations in connection with a bank's efforts to obtain FDIC insurance may not rely on his own wrongdoing as a defense to collection of his notes by the receiver. The Court expanded that rule to cover the situation before it in *D'Oench Duhme:*

> [T]he reach of the rule which prevents an accommodation maker of a note from setting up the defense of no consideration against a bank or its receiver or creditors is not delimited to those instances where he has committed a statutory offense.... [A]n accommodation maker is not allowed that defense as against the receiver of the bank and its creditors, or at times even as against the bank itself, where his act contravenes a general policy to protect the institution of banking from such secret agreements. In some of those cases, the accommoda-

tion maker was party to the scheme of deception, in the sense that he had full knowledge of the intended use of the paper. In others he had no positive idea of committing any fraud upon any one. Yet, he has not been allowed to escape liability on the note as against the receiver even though he was very ignorant and ill-informed of the character of the transaction.

315 U.S., at 458–9, 62 S.Ct., at 680 (citations and quotations omitted).

The Court concluded that the debtor should not be allowed to assert the defenses of lack of consideration and the promise not to call the note because the debtor was responsible for the creation of the note which had appeared as a false asset on the books of the bank. "If the secret agreement were allowed as a defense in this case the maker of the note would be enabled to defeat the purpose of the statute by taking advantage of an undisclosed and fraudulent arrangement which the statute condemns and which the maker of the note made possible. The federal policy under this Act of protecting respondent in its various functions against such arrangements is no less clear or emphatic than the federal policy of outlawing purchases by a bank of its own stock." 315 U.S., at 461–2, 62 S.Ct., at 681.

On its facts, *D'Oench Duhme* reaches only agreements which smack of fraud, or at least make fraud or concealed dealings possible. If the rule of the case is limited to transactions of this sort, if it does not reach a wholly innocent borrower who did not and could not reasonably have been expected to recognize the nature of the deal, then defendant's affirmative defenses may not be dismissed at this point. But the Court does not believe the case can be so narrowed in light of the statute and the other decisions yet to be discussed.

The federal statute which must be considered here is codified as 12 U.S.C. 1823(e). It provides that:

> No agreement which tends to diminish or defeat the right, title or interest of the [FDIC] in any asset acquired by it under this section, either as security for a loan

or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been continuously from the time of its execution, an official record of the bank.

This statute only literally applies to rights of the FDIC in its corporate capacity. But it, like *D'Oench Duhme*, also expresses a judgment that public policy is best served if the regulatory agency is empowered to rely on the face of bank records. The broad reach of this statute is illustrated by the second Supreme Court decision relied upon here.

The second Supreme Court decision is *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987) where the defendant had signed a note, mortgage and personal guaranties with a bank which was subsequently taken over by the FDIC. 108 S.Ct., at 399–400. In defense to a collection suit by the bank (succeeded by the FDIC in its corporate capacity), defendant debtors alleged that the notes had been procured by the bank's misrepresentation of certain material facts about the property which they had purchased. 108 S.Ct., at 400. FDIC responded that any such representations were "agreements" of the sort rendered unenforceable by section 1823(e) unless the requirements of that statute were met. Debtors, on the other hand, contended that the word "agreement" referred to promises, not to false representations of fact.

The Court explained that "[a]s a matter of contractual analysis, the essence of [the debtors'] defense against the note is that the bank made certain warranties regarding the land, the truthfulness of which was a condition to performance of their obligation to repay the loan." 108 S.Ct., at 401. Defendant in this case makes the same argument: FirstSouth made misrep-

resentations of fact (or, which is the same thing, omitted to reveal material facts necessary in order to make the facts stated not misleading), and those misrepresentations allow defendant to avoid repaying the note. And, as in *Langley*, the association's contemporaneous records do not show any connection between the loan memorialized in the note and any particular assets to be purchased with the proceeds or any representations concerning such assets.

The Court noted that the purposes of section 1823(e) are (1) to allow the FDIC to rely on a bank's records in evaluating the bank's assets, especially when it is making the rapid decisions necessary to liquidate or sell a failed bank and (2) to ensure mature consideration of unusual loan transactions by senior bank authorities by requiring that the terms of such transactions be formally approved. "Neither purpose can be adequately fulfilled if an element of a loan agreement so fundamental as a condition upon the obligation to repay is excluded from the meaning of 'agreement.'" 108 S.Ct., 401.

The Court also looked at the principles underlying *D'Oench Duhme* for further illumination of the meaning of the word "agreement," essentially treating that decision and section 1823(e) as being *in pari materia*. 108 S.Ct., at 401–2. The Court concluded:

> Certainly, one who signs a facially unqualified note subject to an unwritten and unrecorded condition upon its repayment has lent himself to a scheme or arrangement that is likely to mislead the banking authorities, whether the condition consists of performance of a counterpromise (as in *D'Oench Duhme*) or of the truthfulness of a warranted fact.

108 S.Ct., at 402.

The Court rejected the debtors' fall-back arguments that section 1823(e) did not apply if the misrepresentations were fraudulent or of the FDIC had knowledge of the asserted defense: "neither fraud in the inducement nor knowledge by the FDIC is relevant to the section's application." 108 S.Ct., at 402. "No conceivable reading of the word 'agreement' in section 1823(e)

could cause it to cover a representation or warranty that is bona fide but to exclude one that is fraudulent." *Id.* The Court distinguished the real defense of fraud in the factum, which would render the note void, and not merely voidable and which would therefore not be cut off by section 1823(e). 108 S.Ct., at 402. But allowing the *Langley* defendants to prevail on their defense would subject the FDIC "not only to undisclosed fraud defenses but also to a wide range of other undisclosed defenses that make a contract voidable, such as certain kinds of mistakes and innocent but material misrepresentations." 108 S.Ct., at 402.

"Finally, knowledge of the misrepresentation by the FDIC prior to its acquisition of the note is not relevant to whether 1823(e) applies." *Id.* The statute did not create any such exception, and the Court declined to create an equitable exception:

> Even if we had the power to do so, the equities petitioners invoke are not the equities the statute regards as predominant. While the borrower who has relied upon an erroneous or even fraudulent unrecorded representation has some claim to consideration, so do those who are harmed by his failure to protect himself by assuring that his agreement is approved and recorded in accordance with the statute. Harm to the FDIC (and those who rely upon the solvency of its fund) is not avoided by knowledge at the time of acquiring the note.

108 S.Ct., at 403. In short, an agreement that meets the requirements of section 1823(e) "prevails even if the FDIC did not know of it; and an agreement that does not meet them fails even if the FDIC knew." *Id.*

The final piece of decisional material upon which this Court relies is *FirstSouth, F.A. v. Aqua Construction, Inc.,* 858 F.2d 441 (8th Cir.1988). That case involved a situation nearly on all fours with *D'Oench Duhme,* in that the defendant, a guarantor, was asserting breach of an unwritten side agreement that the loan proceeds would be disposed of in a certain way. 858 F.2d, at 442. But enroute to applying that doctrine to defeat the guarantor's defenses, the Court cited a large number of the recent Courts of Appeals cases under *D'Oench Duhme.* After its review of this mass of decisions, the Eighth Circuit stated that:

> It is therefore apparent that the federal law is evolving toward the view that FSLIC as receiver enjoys the status of a holder in due course regardless of the manner in which it acquires notes and comparable instruments.

858 F.2d, at 443.

Defendant labels this remark dicta, which it is. But the development of the law identified is, in this Court's judgment as well, "apparent." And that conclusion is not dicta here, it is the basis for the decision. We are dealing with development of the federal common law. The issue raised by defendant's affirmative defenses is whether a borrower should be allowed to raise personal defenses against FSLIC collection efforts. *D'Oench Duhme* and section 1823(e) do not directly answer that question, but in this Court's judgment they identify the policy decisions necessary for the answers. As the Supreme Court said in *Langley,* it is a question of which equities are to prevail: those in favor of an otherwise innocent borrower who has signed a note with unwritten conditions upon its repayment, or those of FSLIC and the depositors and creditors who look to the facially unconditional note for assets against which to assert their claims. And, again as explained in *Langley,* the equities defendant invokes are not the equities the law regards as predominant. *Cf.* 108 S.Ct., at 403.

The analysis followed above also suggests this Court's response to the fact that FIRREA replaced the FSLIC with FDIC and expanded the reach of section 1823(e) to cover FDIC as receiver as well as corporation. One could say that this amendment means that there was no holder-in-due-course-like protection prior to the new law, and that the amendment is an implicit statement of that fact. Alternatively, one could conclude that Congress approved of the protections given to the FDIC by *D'Oench Duhme* and by section 1823(e), and that it wished to explicitly extend those protections to situations where application

was previously a matter of court-made rules. Viewed from that perspective, the common law and the statutes have reached the same point in their development, at about the same time. The courts and the legislature have both concluded that FSLIC should be treated as if it were a holder in due course, which is to say that it is not subject to personal defenses like fraud in the inducement or misrepresentations which could be asserted against the lender. It would be ironic if legislative endorsement of the tendency of the case law were read to avoid the consequences of that tendency.

■ Defendant also asserts lack of capacity, with no detailed explanation of exactly what sort of incapacity is alleged. As explained in *Langley,* the dispositive test of the validity of this defense is whether it is one which voids the obligation, or merely one which makes it voidable. The answer to that question varies from state to state. For example, a leading treatise explains that "[a]lthough there is older authority to the effect that the contracts and executed transactions of the mentally infirm are void, the overwhelming weight of modern authority is to the effect that they are merely voidable, except that if the person so afflicted has been adjudicated an incompetent and a guardian of his property has been appointed prior to entering into the transaction, in many jurisdictions it is deemed void." J. Calamari and J. Perillo, *The Law of Contracts,* sec. 8–10, p. 249 (2d ed 1977). Recognizing this division, the UCC leaves the matter to the law of each state. *See* UCC 3–305(2)(b). In addition to the fact that it is unclear what the incapacity is supposed to be, the parties have not discussed whether the effect of any incapacity should be determined under state (presumably Arkansas) or under federal law, nor have they suggested which way the applicable law goes. Under the circumstances, the Court will not dismiss defendant's affirmative defense of incapacity, though it may well be an appropriate subject for summary judgment.

The net result of the Court's rulings is that partial summary judgment can be granted holding that defendant is liable on the note, subject only to the possible defense of lack of capacity. There is some dispute about the precise amount owed. Amount and capacity are the only two issues remaining for trial.

## SETOFF

■ While not much discussed in the parties papers, it should now be apparent that the setoff issue is of central importance here. Defendant will be allowed to pursue his fraud claims, and could potentially obtain a judgment against First-South. Ordinarily, such a judgment would have to be brought to FSLIC as a claim in the receivership. But defendant asserts a right to setoff the amount of the judgment against the amount due on the note, thus obtaining a super-priority in the distribution of FirstSouth assets under the receivership.

Under a mechanical analysis, one could conclude that the setoff is barred because the FSLIC is treated here as though it were a holder in due course, and an obligor may not assert a right of setoff against a holder in due course. 20 Am.Jur.2d *Counterclaim, Recoupment, and Setoff,* sec. 132 (1965). More substantively, the Court concludes that the setoff should not be allowed because it would frustrate the Congressional intention that all claims against the assets of a failed association should be paid through the administrative process administered by FSLIC. This is not a return to *Hudspeth,* because defendant is allowed to fully litigate his fraud claims and to reduce them to judgment. But he may not assert a right to payment on the judgment once received except through the FSLIC claim process. This result the Court takes to be the very essence of the holding in *Coit.*

IT IS THEREFORE ORDERED THAT FSLIC's motion to dismiss the amended counterclaim, to strike affirmative defenses, and for summary judgment (Docket No. 51) be, and it is hereby, GRANTED IN PART AND DENIED IN PART, AS FOLLOWS:

1. the motion to dismiss the amended counterclaim for failure to state a claim is DENIED;

2. the motion to strike the affirmative defenses of securities fraud, fraud, constructive fraud, negligence, estoppel, illegality, unclean hands, and lack of consideration is GRANTED;

3. the motion to strike the affirmative defense of lack of capacity is DENIED;

4. the motion for summary judgment that defendant is liable for the note at issue here is GRANTED, subject to adjudication of defendant's defense of lack of capacity and of the precise amount owed.