**In re 1301 CONNECTICUT AVENUE ASSOCIATES, Debtor.**

**1301 CONNECTICUT AVENUE ASSOCIATES, Plaintiff,**

**v.**

**The RESOLUTION TRUST CORPORA-TION, Receiver for Baltimore Federal Financial, F.S.A., Defendant.**

**Bankruptcy No. 88–00446.**
**Adv. P. No. 90–1037.**

United States Bankruptcy Court,
District of Columbia.

May 6, 1991.

Michael L. Shor, David R. Kuney, Paul A. Kaplan, for plaintiff.

Thomas C. Beach, III, Paul M. Nussbaum, Stephen F. Fruin, Gary S. Posner, for defendant.

## DECISION GRANTING IN PART AND DENYING IN PART RTC'S MOTION FOR SUMMARY JUDGMENT

S. MARTIN TEEL, Jr., Bankruptcy Judge.

Under the court's consideration is the motion filed by the Resolution Trust Corporation ("RTC"), receiver for Baltimore Federal Financial, F.S.A. ("BFF"), seeking summary judgment as to all counts of the Complaint filed by 1301 Connecticut Avenue Associates ("Associates"). Associates commenced this adversary proceeding by filing a Complaint against BFF seeking compensatory damages in the amount of $2,500,000.00, and punitive damages in the amount of $5,000,000.00, on the theories of breach of contract, breach of fiduciary duty, negligence, and intentional interference with contract. Associates further seeks the equitable subordination of any claim held by BFF to the claims of all other creditors and equity security holders pursuant to Bankruptcy Code § 510(c). After reviewing the memoranda filed by the parties and hearing oral arguments on October 9, 1990, the court concludes that summary judgment is appropriate as to Associates' claim for intentional interference with contract, Count IV of the Complaint. The court also rejects the RTC's argument that it is entitled to prevail as to the remaining counts by virtue of the status of a holder in due course. The court will issue a separate decision as to the RTC's other grounds for seeking summary judgment as to the remaining counts.

## FACTUAL BACKGROUND

Associates is a limited partnership formed for the purpose of acquiring, rehabilitating and operating, for investment, real estate located at 1301–1317 Connecticut Avenue, N.W., Washington, D.C. (the "property"). Associates' interest in the property stems from a Ground Lease executed by Washington Properties Limited Partnership ("Washington Properties") as landlord, and Linsdorff Associates, prede-

cessor in interest to Associates, as tenant. The general and limited partners of Linsdorff Associates were Sollins and Brochendorff, and Realinvest, a general partnership.

In September of 1985, Sollins, on behalf of Linsdorff Associates, obtained from BFF a commitment letter whereby BFF agreed to provide up to $12,500,000.00 as a construction loan to finance the complete rehabilitation and renovation of the property. Sollins raised equity for the project by syndicating limited partnership interests to Dupont Circle Historic Associates ("DCHA").[1] Effective December 24, 1985, a Construction Loan Agreement was executed by BFF and Associates, the new name of the partnership, along with a Deed of Trust Note in the amount of $12,500,-000.00. Associates and Washington Properties also executed a Deed of Trust in favor of BFF, granting and conveying to BFF all of their respective right, title and interest in the property.

On the closing date of the Construction Loan Agreement, BFF disbursed $1,332,-000.00 to Associates. Subsequently, disbursements were made pursuant to draw requests, monthly applications requesting the advance of loan proceeds submitted by Sollins and Brochendorff, the general partners. In or about September 1986, BFF learned that Associates had not met certain financial obligations to Sigal Construction Corp., the general contractor on the property. Immediately thereafter, BFF ceased funding draw requests directly to Sollins and Brochendorff, and began making payments directly to the partnership's obligees.

In late 1986, Washington Properties sought to remove Sollins and Brochendorff as managing partners of Associates. By letter dated January 27, 1987, Washington

Properties informed BFF that Sollins and Brochendorff had been removed as managing partners, and Associates' nominee, 1301 Assets, had assumed complete operating control of the partnership. However, in March of 1987, Washington Properties reached an agreement with Sollins and Brochendorff allowing them to remain as managing partners of Associates. Later that month, the removal of Sollins and Brochendorff as managing partners was again sought, this time in a lawsuit filed by Dover Administrative Services, Inc. ("Dover"), the general partner of DCHA.

On the basis that Associates had defaulted on the Construction Loan Agreement and the Deed of Trust, BFF refused to disburse loan proceeds for the months of April and May, 1987. BFF served a Notice of Default on Associates by letter dated April 21, 1987. On July 2, 1987, Washington Properties issued a Notice of Default for Associates' failure to pay the rent due under the Ground Lease. A few days later, BFF gave Associates advance notice of its intent to foreclose on the property. A Formal Notice of Foreclosure Sale of Real Property was served upon Associates on or about July 13, 1987, which stated that a foreclosure sale of the property would be held on or about September 3, 1987.

Pursuant to a settlement of the lawsuit brought by Dover, Sollins and Brochendorff resigned as managing partners, and were admitted as non-voting limited partners; Dover became, and remains, the managing general partner, as well as the administrative general partner; and 1301 Assets withdrew as corporate general partner. Notwithstanding Dover's assumption of control over the partnership's operations and its assurances that it would cure any defaults under the Ground Lease, Washing-

---

**1.** After the syndication of limited partnership interests to DCHA, the partnership consisted of Sollins and Brochendorff as individual general partners, serving jointly as managing general partners; 1301 Assets, Inc., a District of Columbia corporation wholly owned by Sollins and Brochendorff, serving as corporate general partner; Dover Administrative Services, Inc., ("Dover"), a Delaware corporation, serving as administrative general partner; and, DCHA, a District of Columbia limited partnership, the sole limited partner. Adam Kauffman became administrative general partner because Dover was not registered in the District of Columbia. DCHA consisted of Dover, as corporate general partner, Adam Kauffman, as individual general partner, and approximately 86 individual investors who purchased 58 limited partnership units.

ton Properties served Notices of Termination upon Associates, which stated that the Ground Lease would terminate on August 20, 1987, and brought civil proceedings in the Superior Court for the District of Columbia seeking the eviction of Associates from the property. Several months later, on December 24, 1987, the Construction Loan matured. On or about February 8, 1988, BFF notified Associates that the loan was due and payable in the amount of $11,428,387.38, and that foreclosure proceedings would be initiated if the full amount was not paid within 10 days. On February 16, 1987, Associates filed a voluntary petition for relief in the Eastern District of Pennsylvania, which case was subsequently transferred to this court.

In the bankruptcy proceeding, BFF filed a proof of claim against Associates in the amount of $11,638,515.00. On January 9, 1990, Associates filed an objection to the proof of claim filed by BFF, asserting that the amount of the claim is incorrect as it overstates the amount due under the Construction Loan, and that BFF improperly advanced funds to Sollins and Brochendorff and failed to monitor the use of properly disbursed funds. On or about February 22, 1990, BFF filed a motion requesting the court to designate Associates' objection to its claim as an adversary proceeding, and on April 2, 1990, Associates filed the Complaint in this adversary proceeding. Associates' complaint does not specifically seek disallowance of the BFF claim in its complaint but has made clear in other papers that it wishes to set off the claim of BFF by any recovery. The issue is of importance in evaluating any proposed plan of reorganization.

RTC'S MOTION FOR SUMMARY JUDGMENT

On August 22, 1990, the RTC filed a motion for summary judgment as to all counts in Associates' Complaint. Associates filed an opposition, and a hearing was held on October 9, 1990. During oral arguments, the RTC raised for the first time the federal holder in due course defense, relying upon the Fifth Circuit's recent decision in *Campbell Leasing, Inc. v. FDIC*, 901 F.2d 1244 (5th Cir.1990). After hearing the arguments of counsel, the court gave Associates a period of ten days in which to brief this newly raised issue, and an equal amount of time for the RTC to respond.

■ As a preliminary matter, Associates argues that the RTC is procedurally barred from raising the federal holder in due course defense because it was not raised as an affirmative defense as required by Fed.R.Civ.P. 8(c), made applicable by Bankruptcy Rule 7008. Technically the RTC does not assert the holder in due course doctrine as a defense to the complaint's first four counts asserting monetary claims. Rather, it asserts that the doctrine bars any assertion of these "personal" claims as defenses or setoff to Associates' debt to BFF. As *Campbell Leasing* makes clear, the RTC as receiver of BFF still must defend against any assertion of these claims against the receivership estate. *Campbell Leasing*, 901 F.2d at 1249. In contrast to the counts for monetary claims, the doctrine does appear to be asserted as an affirmative defense with respect to the last count seeking equitable subordination. Generally, the failure to plead an affirmative defense results in the waiver of that defense and its exclusion from the case. *Camalier & Buckley–Madison, Inc. v. Madison Hotel, Inc.*, 513 F.2d 407, 419 n. 92 (D.C.Cir.1975); *Carey Canada, Inc. v. California Union Insurance Co.*, 748 F.Supp. 8, 14 (D.D.C.1990). However, courts have allowed defendants to amend their pleadings and assert affirmative defenses where plaintiffs were not unfairly surprised or significantly prejudiced. *See e.g., Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797 (11th Cir. 1989) (where the defendant raised the statute of limitations defense in a motion for summary judgment filed approximately one month before trial, the plaintiff was not prejudiced and the district court correctly addressed the issue on the merits); *Devalk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 334 (7th Cir.1987) (when parties argue an affirmative defense in the district court, technical failure to plead the defense is not fatal); *United States v. Continental Illinois National Bank and*

*Trust Co. of Chicago,* 889 F.2d 1248, 1255 (2nd Cir.1989) (where it was a close question as to whether the "buyer in ordinary course of business" defense was an affirmative defense, and plaintiff could show neither surprise nor significant prejudice, the bankruptcy court abused its discretion in denying defendant's motion to amend its answer to assert the defense).

In this case, the RTC raised as a defense the doctrine of federal holder in due course for the first time at oral arguments on its motion for summary judgment. The case relied upon by the RTC for the applicability of the defense to this case was not decided until May 24, 1990, almost one month after the answer to Associates' Complaint was filed by BFF on April 27, 1990.[2] Thus, the RTC can be excused for the absence of the federal holder in due course defense in the answer to Associates' complaint. Further, the issue raised by the RTC is primarily legal, and can be decided without the necessity of further discovery. Accordingly, as Associates was given the opportunity to brief the issue, the court concludes that no prejudice to Associates will result from its consideration of the issue in ruling on the RTC's motion for summary judgment.

■ At the hearing on its motion for summary judgment, the RTC argued that it is entitled to federal holder in due course status with respect to its loan instruments, and that the five counts in Associates' complaint allege personal defenses, rather than real defenses, which cannot be asserted against a holder in due course. The RTC relies upon *Campbell Leasing* to support its argument. In *Campbell Leasing,* the maker of a promissory note, Campbell Leasing, Inc. ("Campbell Leasing") and the personal guarantor, sued the lender, RepublicBank Brownwood ("RepublicBank"), after the bank seized an airplane which secured the loan. *Campbell Leasing,* 901 F.2d at 1247. RepublicBank counterclaimed for payment of the note, plus interest, costs, and attorneys' fees.

Subsequently, the successor of RepublicBank was declared insolvent, and the FDIC was appointed receiver. The FDIC entered into a purchase and assumption agreement with a federally established bridge bank, which purchased the promissory note, security agreement, and guarantee at issue. The bridge bank and the FDIC removed the lawsuit against RepublicBank to federal court and filed a motion for summary judgment. The district court granted summary judgment in favor of the FDIC and the bridge bank, concluding that all of the claims and affirmative defenses asserted by the plaintiffs, including the claims that RepublicBank failed to deal with plaintiffs fairly and in good faith and tortiously interfered with their attempt to lease and the plane, were barred by the federal common-law estoppel doctrine announced in *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) and the holder in due course doctrine announced in *FDIC v. Wood,* 758 F.2d 156 (6th Cir.), *cert. denied,* 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 286 (1985).

The plaintiffs appealed on the grounds, *inter alia,* that the federal holder in due course doctrine does not bar their claims against RepublicBank. *Campbell Leasing,* 901 F.2d at 1247. The Fifth Circuit rejected their argument, concluding that the various claims and defenses asserted by the plaintiffs to liability on the note were "personal" defenses, and that the federal holder in due course doctrine bars the makers of promissory notes from asserting "personal" defenses against the FDIC in connection with purchase and assumption transactions involving insolvent banks. *Id.* at 1248–49. The plaintiffs challenged this conclusion contending that the federal holder in due course doctrine does not apply where the FDIC is acting as a receiver, rather than in its corporate capacity. The Fifth Circuit rejected this argument, finding no logical reason to limit federal holder in due course protection to the FDIC in its corporate capacity, and held that the FDIC enjoys holder in due course status as a

---

**2.** The RTC was substituted for BFF as the defendant in this action by order entered on May 24, 1990, effective April 20, 1990, nunc pro tunc.

828

matter of federal common law whether it is acting in its corporate or its receivership capacity. 901 F.2d at 1249.

However, the court also held that the district court erred in granting summary judgment against the plaintiffs on all of their claims. The court found that the plaintiffs had a statutory right to continue their action against the FDIC, as receiver for the successor of RepublicBank, on their claims of tortious interference with contract, breach of the Campbell Leasing agreement, and intentional infliction of mental and emotional distress, pursuant to 12 U.S.C. § 1821(d)(6)(A). While noting that the federal holder in due course doctrine prevented the plaintiffs from asserting these claims as a setoff to liability on the note, the court concluded that it does not prevent the plaintiffs from trying these claims to the district court, liquidating the amount of damages, and subsequently receiving a pro-rata share of the insolvent bank's remaining assets along with the bank's other creditors. *Campbell Leasing*, 901 F.2d at 1249.

In their supplemental brief, Associates argues that the RTC is not entitled to protection under the federal holder in due course doctrine in this case because the defense is available only when the RTC acquires a note in a purchase and assumption transaction. A purchase and assumption transaction is one of two basic methods available to the FDIC[3] for dealing with an insolvent institution's assets when it is appointed as receiver of a closed institution. *See generally*, Platt and Darby, *A Primer on the Special Rights and Immunities of the Federal Deposit Insurance Corporation*, 11 Okla. City U.L.Rev. 638 (1986). In *Gunter v. Hutcheson*, 674 F.2d 862, 865 (11th Cir.1982), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982), the court described these methods as follows:

The Federal Deposit Insurance Corporation is a federal agency which insures bank deposits. As insuror one of the

primary duties of the FDIC is to pay the depositors of a failed bank. The FDIC has two methods of accomplishing this duty. The simplest method is to liquidate the assets of the bank and then pay the depositors their insured amounts, covering any shortfall with insurance funds. ...

[Alternatively] the FDIC whenever feasible employs a "purchase and assumption" transaction in which the Corporation attempts to arrange for another bank to "purchase" the failed bank and reopen it without interrupting banking operations and with no loss to the depositors. A purchase and assumption involves three entities: the receiver of the failed bank, the purchasing bank, and the FDIC as insuror. In most cases, the FDIC is appointed receiver by the appropriate banking authority and thus acts in two separate capacities: as receiver and as corporate insuror. ...

As soon as the receiver is appointed, the FDIC solicits bids from other banks for the purchase of the failed bank and assumption of its liabilities. The bids represent the "going concern" value of the failed bank. After receiving the bids, the FDIC Board of Directors determines whether the purchase and assumption is feasible according to the statutory requirements of 12 U.S.C. § 1823(e). If a bid is accepted, the purchasing bank agrees with the receiver to buy the assets and assume the liabilities of the failed bank.

*Gunter v. Hutcheson*, 674 F.2d at 865 (footnotes omitted). In *Gunter*, the court held that as a matter of federal common law, the FDIC has a complete defense to state and common law fraud claims, but limited its holding to notes acquired by the FDIC in the execution of a purchase and assumption transaction, for value, in good faith, and without actual knowledge of the fraud at the time the FDIC entered into the purchase and assumption agreement. *Id.* at 873. The court's rationale for limiting its holding is stated as follows:

**3.** The RTC, as receiver, has the same powers and rights as the FDIC has under 12 U.S.C. §§ 1821, 1822, and 1823, with respect to insured

depository institutions. 12 U.S.C. § 1441a(b)(4).

First, because this rule is based largely upon the need for quick decisions by the FDIC regarding the method to best handle a bank failure, the rule applies only when the FDIC acquires a note in the execution of a purchase and assumption transaction. In other, more normal, commercial contexts, we see no reason to relieve the FDIC from the ordinary operation of state law. Second, because another primary basis of the rule is the need for the FDIC to rely on the books and records of the failed bank in assessing its potential liability under a purchase and assumption vis-a-vis a liquidation, the protection from unknown fraud is available only to the extent the FDIC pays value for the note and thereby jeopardizes a portion of the insurance fund. Finally, we require that the FDIC have taken the note in a good-faith execution of its part of the purchase and assumption transaction.

*Gunter v. Hutcheson,* 674 F.2d at 872–73.

Associates argues that courts have consistently limited the FDIC's federal holder in due course status to purchase and assumption transactions, relying, in large part, on one or both of the rationales expressed in *Gunter. See, In re Kanterman,* 97 B.R. 768, 777 (Bankr.S.D.N.Y. 1989), *aff'd,* 108 B.R. 432 (S.D.N.Y.1989) (bankruptcy court rejected the FDIC's argument that the Trustee was precluded by federal law from seeking to avoid as a fraudulent conveyance the FDIC's interest in a mortgage and mortgage note conveyed by the debtor, concluding that the rule precluding all defenses except those assertable against a holder in due course did not apply because the case involved a mortgage and note held by the FDIC as receiver, rather than pursuant to a purchase and assumption transaction). Further, Associates argues that *Campbell Leasing* does not support the RTC's argument that the federal holder in due course doctrine applies in this case because *Campbell Leasing* involved a purchase and assumption

transaction, whereby a federally established bridge bank acquired the promissory note, security agreement, and guarantee.

The RTC counters this argument by noting that the court in *Campbell Leasing,* without clearly distinguishing between the rights of the bridge bank and those of the FDIC, held as follows:

> We find no logical reason to limit federal holder in due course protection to the FDIC in its corporate capacity, to the exclusion of its receivership function. In its corporate capacity, the FDIC is obligated to protect the depositors of a failed bank, while the FDIC as receiver must also protect the bank's creditors and shareholders. In both cases, the holder in due course doctrine enables the FDIC to efficiently and effectively fulfill its role, thus minimizing the harm to depositors, creditors, and shareholders. For example, the doctrine prevents note makers from gaining absolute priority over a failed bank's assets, by asserting "personal" claims as defenses or setoff to their notes, to the detriment of the bank's other creditors and potentially its depositors. We conclude that the FDIC enjoys holder in due course status as a matter of federal common law whether it is acting in its corporate or its receivership capacity.

*Campbell Leasing,* 901 F.2d at 1249 (citations omitted). The RTC emphasizes that if only the bridge bank had holder in due course status, the quoted passage would be superfluous. The RTC construes the court's holding as saying that even though the FDIC, as receiver, had not acquired the note in a purchase and assumption transaction, it nevertheless acquired holder in due course status with respect to the plaintiff's claims of setoff. The RTC argues that under this reading of *Campbell Leasing,* the bridge bank took the notes free and clear of all personal defenses, and the FDIC, as receiver, "held the notes subject to personal defenses only from the estate, but not as a setoff on the notes." [4] Fur-

---

4. RTC brief at 10–11. The FDIC presumably means that the FDIC, as receiver, before and after sale of the notes, could be sued to establish

any claim against the receivership estate based on the acts asserted as personal defenses by the obligor but that by virtue of holder in due

ther, the RTC argues that to hold otherwise would permit the note makers to gain "absolute priority" over a failed bank's assets, which is wholly inconsistent with public policy and federal receivership law.

However, the RTC's interpretation of the holding in *Campbell Leasing* is not supported by the Fifth Circuit's recent decision in *Sunbelt Savings, FSB Dallas, Texas v. Montross*, 923 F.2d 353 (5th Cir.1991). In *Sunbelt Savings*, the court faced the issue of whether the federal holder in due course doctrine protects the FDIC and its successors from personal defenses to the enforcement of non-negotiable instruments. 923 F.2d at 355. In deciding the issue, the court reviewed its prior decisions and their underlying policy, stating as follows:

> The federal holder in due course doctrine bars makers of promissory notes from asserting personal defenses against the FDIC and its successors in connection with purchase and assumption transactions involving troubled financial institutions. *See FSLIC v. Murray*, 853 F.2d 1251, 1256 (5th Cir.1988). The FDIC enjoys this protection as a matter of federal common law so that it may achieve the congressional mandate of the "sound, effective, and uninterrupted operation of the [nation's] banking system with resulting safety and liquidity of bank deposits." S.Rep. No. 1269, 81st Cong., 2d Sess., *reprinted in* 1950 U.S.Code Cong. & Admin.News 3765, 3765–66; *see also Campbell Leasing*, 901 F.2d at 1244–46. The federal holder in due course doctrine facilitates uninterrupted operation of the banking system by allowing the FDIC to complete purchase and assumption transactions quickly and based on the face value of a failed bank's negotiable instruments, obviating the need to scrutinize the instruments for personal defenses. The doctrine also prevents makers from using personal defenses to gain priority over the failed bank's creditors' and depositors' rights to the note proceeds.

*Sunbelt Savings*, 923 F.2d at 355.

The court further noted that its holdings have been limited, stating that in *Murray*,

course status the personal defenses could not be set off against the obligations represented by the

its holding was "expressly limited to *negotiable instruments* acquired by purchase and assumption"; and that in *Campbell Leasing*, the court extended the holder in due course doctrine by holding that the FDIC and its successors may be federal holders in due course without meeting the technical state-law requirements for holder in due course status. 923 F.2d at 355–56. The court does not state that its decision in *Campbell Leasing* extended the holder in due course doctrine to notes acquired by the FDIC outside a purchase and assumption transaction. The Fifth Circuit's recognition in *Sunbelt Savings* that the federal holder in due course doctrine facilitates uninterrupted operation of the banking system by allowing the FDIC to complete purchase and assumption transactions belies the RTC's interpretation of *Campbell Leasing*. Thus, it appears that the Fifth Circuit did not eliminate the requirement that a note be acquired in connection with a purchase and assumption transaction in order for the federal holder in due course doctrine to apply. In this light, *Campbell Leasing* must be limited to its facts as merely holding that when the FDIC as receiver makes a sale to a bridge bank of a negotiable instrument, the bridge bank, because of the FDIC's special status, must be imbued with holder in due course status. This limitation of *Campbell Leasing* is consonant with cases in other courts of appeals which even more clearly limit the holder in due course doctrine to purchase and assumption transactions. *E.g., FDIC v. Gulf Life Ins. Co.*, 737 F.2d 1513, 1518 (11th Cir.1984).

Even if the Fifth Circuit's decision in *Campbell Leasing* could be construed as holding that the federal holder in due course doctrine applies regardless of whether the note was acquired in connection with a purchase and assumption transaction, the Fifth Circuit's actual holding in *Sunbelt Savings*, if followed, would preclude the application of the doctrine in this

notes.

case on an independent basis. In *Sunbelt Savings,* the court declined to extend its holdings in *Murray* and *Campbell Leasing* to non-negotiable instruments. *Sunbelt Savings,* 923 F.2d at 357. The instrument at issue in *Sunbelt Savings* was a $1.1 million variable interest promissory note. *Id.* at 354. Distinguishing between negotiable instruments, which enjoy various protections under Article Three of the Uniform Commercial Code, and non-negotiable instruments, which are contractual obligations which do not enjoy holder in due course protections, the court stated that the makers of variable interest rate notes sign only a contractual obligation to repay their debt, and have no expectation that the holder in due course doctrine would strip them of their defenses. *Id.* at 356. Accordingly, the court concluded that allowing the FDIC to transform contracts into negotiable instruments by extending the holder in due course status to the FDIC and its successors with regard to non-negotiable instruments would defeat the reasonable commercial expectations of the variable interest note makers. *Sunbelt Savings,* 923 F.2d at 357. *See also, FDIC v. Galloway,* 613 F.Supp. 1392, 1402 (D.Kan. 1985), *rev'd on other grounds,* 856 F.2d 112 (10th Cir.1988) (federal holder in due course status did not apply to guaranty agreements acquired by the FDIC since agreements were not "negotiable instruments" within the meaning of the Uniform Commercial Code). *Contra, FDIC v. Gulf Life Insurance Co.,* 737 F.2d 1513, 1518 (11th Cir.1984) (federal holder in due course doctrine applies to *any asset* obtained by the FDIC in a purchase and assumption transaction, for value, in good faith, and without knowledge of defenses). I need not decide whether the Fifth Circuit or Eleventh Circuit is correct in this conflict between the circuits but only note that if *Sunbelt Savings* was correctly decided, the holder in due course defense is unavailable here.

■ The Deed of Trust Note evidencing the Construction Loan Agreement in this case is non-negotiable. The Deed of Trust Note is in "the principal sum of Twelve Million Five Hundred Thousand and no/100 Dollars ($12,500,000.00), *or so much thereof as may be advanced hereunder,* together with interest payable thereon as hereinafter provided." (emphasis added). The interest rate provided by the Deed of Trust Note is a variable rate tied to the prime rate in effect when a payment of interest is required. Further, the Deed of Trust Note evidences a construction loan in an amount not to exceed $11,500,000.00. However, the note also provides, *inter alia,* that the borrower shall have the right to increase the amount of the construction loan to a maximum of $12,500,000.00, upon the satisfaction of certain conditions listed in the note. Thus, the Deed of Trust Note in this case is not a negotiable instrument in that it does not "contain an *unconditional* promise to pay a *sum certain* in money and no other promise, order, obligation or power given by the maker or drawer." D.C.Code § 28:3–104 (emphasis added). Therefore, contrary to the RTC's argument, Fifth Circuit case law does not support the application of the federal holder in due course doctrine in this case because the Fifth Circuit has limited its application of the doctrine to negotiable instruments, and the Deed of Trust Note in this case is not negotiable.[5]

*Intentional Interference with Contract*

In Count IV of its Complaint, Associates alleges that BFF intentionally and willfully interfered in and with the contractual relationship between Washington Properties and itself, as landlord and tenant, by secretly meeting and conspiring with Washington Properties for the purpose of evict-

5. While concluding that the federal holder in due course doctrine does not apply in this case to preclude the setoff of any recovery by Associates on its claims against the claim filed by BFF, the court reserves the issue of whether Associates is entitled to setoff under the provisions of the Bankruptcy Code. *See FSLIC v. Smith,* 755 F.Supp. 1432, 1441 (E.D.Ark.1989). The parties have not briefed that issue. Even if I were to reject the dicta in *Smith* and hold that setoff against the FDIC is not generally proscribed, setoff could not be asserted for punitive damage claims. *Tuxedo Beach Club Corp. v. City Federal Sav. Bank,* 749 F.Supp. 635 (D.N.J.1990).

ing Associates from the leased property and/or foreclosing upon Associates' interest therein. Associates also alleges that BFF improperly declared Associates to be in default under the terms of the Construction Loan Agreement, Deed of Trust Note, and Deed of Trust, knowing that any defaults thereunder constituted default under the Ground Lease. Further, Associates alleges that BFF improperly withheld advances of properly requested loan proceeds, preventing timely payment of Associates' obligations to Washington Properties and other creditors, knowing that the failure to pay those obligations constituted events of default under the Ground Lease and further subjected Associates to liens and other actions to recover for unpaid obligations. As a direct and proximate cause of BFF's actions, Associates claims that Washington Properties issued numerous notices of default, declared the Ground Lease to be terminated, and initiated two civil proceedings to recover possession of the property.

█ Tortious interference with contractual relations arises when a defendant interferes with a contract between the plaintiff and some third party. *Weaver v. Gross*, 605 F.Supp. 210, 216 (D.D.C.1985); *Donohoe v. Watt*, 546 F.Supp. 753, 757 (D.D.C.1982); *aff'd*, 713 F.2d 864 (D.C.Cir. 1983). In order to establish a claim for intentional interference with contract, the plaintiff must prove 1) the existence of a contract; 2) the defendant's knowledge of the contract; 3) an intentional procurement of a breach of the contract by the defendant; and 4) damages resulting from that breach. *Alfred A. Altimont v. Chatelain, Samperton & Nolan*, 374 A.2d 284, 288 (D.C.1977). Summary judgment on this count is appropriate if the record before the court shows that there is no genuine issue as to any material fact and the RTC is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56.

█ In its motion for summary judgment, the RTC acknowledges the existence of, and BFF's knowledge of, the Ground Lease between Washington Properties and Associates. However, the RTC argues that Associates has failed to offer any evidence which would support a finding that BFF intentionally procured Washington Properties' breach of the Ground Lease, if in fact a breach had occurred. The RTC argues that BFF's declaration of a default of the Construction Loan Agreement does not provide a foundation for a claim of intentional interference with contract. Further, even assuming that BFF met, secretly or otherwise, with Washington Properties to discuss Associates' defaults under the Ground Lease and the Construction Loan Agreement, the RTC argues that such consultations do not give rise to a claim for intentional interference with contract.

The court agrees with the RTC on this issue. Even if the court were to find that BFF held secret meetings with Washington Properties in order to discuss defaults under the Ground Lease and the Construction Loan Agreement, without more, such evidence is insufficient to establish an intentional procurement by BFF of Washington Properties' breach of the Ground Lease, assuming a breach had in fact occurred. It is understandable that BFF would meet with Washington Properties to discuss the status of the loan given the fact that pursuant to the Deed of Trust, Washington Properties subordinated its fee interest to BFF's loan, and was given the opportunity to cure a default in the payment of the loan upon written notice of the default by BFF. Without evidence of specific actions taken by BFF with the intent to induce Washington Properties to breach the Ground Lease, Associates' claim for intentional interference with contract cannot go forward.

█ Further, the court rejects Associates' argument that BFF procured Washington Properties' breach of its duty of good faith and fair dealing, as well as its wrongful attempt to terminate the Ground Lease, by allowing Sollins and Brochendorff to divert funds, and by failing to monitor the construction properly. While the allegations that BFF allowed Sollins and Brochendorff to divert funds and failed to monitor the construction properly may serve as a basis for Associates' claims of

breach of contract, breach of fiduciary duty, or negligence, they do not form a basis for a claim of intentional interference with contract. Interference with a contract between a plaintiff and a third party, which is caused by the defendant's breach of his own contract with plaintiff, serves as no basis for a claim of intentional interference with contract. *Business Equipment Center, Ltd. v. DeJur–Amsco Corp.*, 465 F.Supp. 775, 788 (D.D.C.1978). Assuming BFF breached its contract with Associates, which resulted in the breach of the Ground Lease, the remedy is not a claim for intentional interference with contract; rather, it is an element of damages for Associates' breach of contract claim.

Because Associates has not set forth specific facts, as required by Rule 56(e), Fed. R.Civ.P., showing that there is a genuine issue for trial on its claim of intentional interference with contract [6], the court concludes that summary judgment is appropriate as to Count IV of Associates' complaint.

An appropriate order will be entered with this decision.

---

6. At oral arguments on the motion for summary judgment, counsel for Associates was unable to direct the court's attention to any specific facts supported by the record before the court that would provide a basis for finding that BFF intentionally interfered with the Ground Lease between Associates and Washington Properties.